## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREDERICK J. LAHOVSKI, JR.,** | : | |
| **Plaintiff** | : | **NO.** |
| | : | |
| **vs.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **BOROUGH OF NAZARETH,** | : | |
| **FRED C. DAUGHERTY, JR., INDIVIDUALLY** | : | |
| **AND IN HIS FORMER CAPACITY AS** | : | |
| **MAYOR OF THE BOROUGH OF** | : | |
| **NAZARETH, THOMAS M. TRACHTA,** | : | |
| **INDIVIDUALLY AND IN HIS CAPACITY AS** | : | |
| **CHIEF OF POLICE, NAZARETH BOROUGH** | : | |
| **COUNCIL, JACK HERBST, LARRY STOUDT,** | : | |
| **FRANK MAUREK, MICHAEL KOPACH,** | : | |
| **CYNTHIA WERNER, CHARLES DONELLO,** | : | |
| **DANIEL CHIAVAROLI, WILLIAM MATZ,** | : | |
| **CARL FISCHL, INDIVIDUALLY AND IN** | : | |
| **THEIR CAPACITY AS MEMBERS OF** | : | |
| **NAZARETH BOROUGH COUNCIL AND** | : | |
| **CARL R. STRYE, JR., INDIVIDUALLY AND** | : | |
| **IN HIS CAPACITY AS MAYOR OF THE** | : | |
| **BOROUGH OF NAZARETH,** | : | |
| **Defendants** | : | |

## COMPLAINT

## JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and

1343(1), (3) and (4). This is an action for damages and/or injunctive relief authorized, arising

under and instituted under 42 U.S.C.A. 2000(e)-5(f), 28 U.S.C.A. 1343(1)(3)(4), 42 U.S.C.A.

1983, 1985 and the First and Fourteenth Amendments to the Constitution of the United States.

-1-

The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by 42U.S.C.A.2000e *et seq* providing for injunctive and other relief against racial discrimination in employment. State claims are brought pursuant to the Pennsylvania Constitution and under the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

2.      All conditions precedent to jurisdiction under 42 U.S.C.A. 2000-e5(f)(3) have occurred or been complied with.

3.      Venue is appropriate in the Eastern District of Pennsylvania. Plaintiff resides and the Defendants conduct business in this District and the causes of action arise out of events which took place in this District.

## PARTIES

4.      Plaintiff Frederick J. Lahovski, Jr. (hereinafter "Plaintiff") is an adult individual residing at 2204 Easton Avenue, Bethlehem, Northampton County, Pennsylvania 18017.

5.      Defendant Borough of Nazareth, (hereinafter "Defendant Borough") is a political subdivision in the County of Northampton, governed by the laws of the Commonwealth of Pennsylvania with its principal address at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064.

6.      Defendant Nazareth Borough Council (hereinafter "Borough Council") is a legislative branch of the Defendant Borough with the legal authority to terminate employees of the Defendant Borough with its principal address at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064.

7.      Defendant Fred C. Daugherty, Jr., (hereinafter "Defendant Daugherty") is

-2-

an adult individual who at all times relevant to the within action served in the capacity of mayor of the Defendant Borough, having been elected pursuant to general elections which took place in November, 2009 and whose office was located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Daugherty is sued in his individual capacity and in his former capacity as Mayor of the Defendant Borough.

8.     Defendant Thomas M. Trachta, (hereinafter "Defendant Trachta"), is an adult individual who, at all times relevant to the within action, served as Chief of Police for the Defendant Borough's police department and whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Trachta is sued in his individual capacity and in his capacity as Chief of Police for the Defendant Borough's police department.

9.     Defendant Jack Herbst, (hereinafter "Defendant Herbst"), is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Herbst is sued in his individual and official capacities.

10.    Defendant Councilman Larry Stoudt, (hereinafter "Defendant Stoudt") is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Stoudt is sued in his individual and official capacities.

11.    Defendant Councilman Frank Maurek, (hereinafter "Defendant Maurek") is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton

County, Pennsylvania 18064. Defendant Maurek is sued in his individual and official capacities.

12.     Defendant Councilman Michael Kopach, (hereinafter "Defendant Kopach") is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Kopach is sued in his individual and official capacities.

13.     Defendant Councilwoman Cynthia Werner, (hereinafter "Defendant Werner" is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Werner is sued in her individual and official capacities.

14.     Defendant Councilman Charles Donello, (hereinafter "Defendant Donello") is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Donello is sued in his individual and official capacities.

15.     Defendant Councilman Daniel Chiavaroli, (hereinafter "Defendant Chiavaroli") is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Chiavaroli is sued in his individual and official capacities.

16.     Defendant Councilman William Matz, (hereinafter "Defendant Matz") is

-4-

an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Matz is sued in his individual and official capacities.

17.     Defendant Councilman Carl Fischl, (hereinafter "Defendant Fischl") is an adult individual who, at all times relevant to the within action, served as a member of Borough Council whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Fischl is being sued in his individual and official capacities.

18.     Defendant Carl R. Strye, Jr., (hereinafter "Defendant Strye"), is an adult individual, who at all times relevant to the within action, serves as Mayor of the Defendant Borough and whose office is located at 134 South Main Street, Nazareth, Northampton County, Pennsylvania 18064. Defendant Strye is sued in his individual and official capacities.

## FACTS GIVING RISE TO CAUSE OF ACTION

19.     Plaintiff began his employment on a part-time basis with Defendant Borough in February, 2008.

20.     Plaintiff's employment by the Defendant Borough as a police officer did not require political affiliation.

21.     In July, 2008, Plaintiff, a probationary full-time police officer for the Defendant Borough, became a member of the Nazareth Borough Police Association. (hereinafter "the Association").

22.     As a police officer for the Defendant Borough Plaintiff exercised his right to speak on matters of public concern and filed petitions for the redress of grievances, grievances and appeals.

-5-

23.    During the course of his employment as a police officer, Plaintiff engaged in speech and filed petitions, grievances and appeals, wherein he sought to communicate with the public and to advance points of view on matters of public concern and/or to advance political or social points of view beyond the employment context.

24.    Plaintiff, as a pubic employee and police officer for the Defendant Borough, had the fundamental right to free speech and to petition the government for the redress of grievances as aforesaid.

25.    In his capacity as a member of the Association, Plaintiff was given responsibility for union advocacy, including, but not limited to the filing of grievances, unfair labor practices and complaints of governmental waste and criminal behavior.

26.    Plaintiff spoke with other police officers  on a regular basis, investigated complaints by the individual officers, assisted the officers in filing grievances and unfair labor practices and testified at grievance hearings, hearings before Borough Council and arbitrations.

27.    On January 30, 2009, Plaintiff was promoted to the position of Detective.

28.    On a regular basis Plaintiff during the course of his employment, spoke out and attempted to communicate to the public concerning practices, policies and customs employed by Defendants, by and through their supervisory/management level and/or elected officials, which were unfair or unjust to employees, applicants and residents of the Defendant Borough, which involved political or social issues and matters of public concern and which were more than simple everyday employment issues.

29.     During the course of his employment as a police officer for the Defendant Borough, Plaintiff observed supervisory and management level employees of the Defendant Borough, including Defendants Daugherty and Trachta display an openly hostile and insulting attitude against employees and potential employees of the Nazareth Police Department based on their race, color, national origin, gender and sexual orientation.

30.     During the calendar years 2009 through 2011, Plaintiff spoke publicly on matters of public concern involving police officers who were the subject of the Defendants' unlawful and discriminatory conduct due to their race, gender and sexual orientation.

### Speech - Officer Vanessa Cruz-Smith

31.     Defendant Borough employed a female Puerto Rican police officer named Vanessa Cruz-Smith (hereinafter "Ms. Cruz-Smith") who became the first Puerto Rican and female police officer ever hired by the Defendant Borough.

32.     Plaintiff became aware of comments attributed to a former supervisory/management level employee of the Defendants suggesting that Ms. Cruz-Smith should not "advertise" her national origin and ethnicity, "because wetbacks" were not common in the area serviced by the Defendant Borough's police department.

33.     On numerous occasions during the course of his employment, Plaintiff complained about the attitudes of Defendant Trachta, Defendant Daugherty and other members of Borough Council which were hostile to minorities and females who applied for positions as police officers for the Defendant Borough.

34.     Prior to June, 2009, Defendants initiated a disciplinary proceedings against Ms. Cruz-Smith and terminated her employment effective June 1, 2009.

35.    In July, 2010, Ms. Cruz-Smith filed a civil rights action in the United States District Court for the Eastern District of Pennsylvania.

36.    Plaintiff further advised the Defendants, other co-employees and other residents of the Defendant Borough that he intended to testify on Ms. Cruz-Smith's behalf in her federal litigation.

37.    In August, 2010, Plaintiff met with the Defendant Borough Solicitor Alfred S. Pierce, Esquire, (hereinafter Mr. Pierce), Defendant Trachta, Mr. Kokolus, Rufus Jennings, Esquire and Carla Manesca, Esquire, the legal counsel for the Defendants in Ms. Cruz-Smith's federal lawsuit.

38.    During this conference, Plaintiff complained to those in attendance about the unlawful and disparate treatment of Ms. Cruz-Smith by the Defendant Borough, Defendant Daugherty, Defendant Trachta and Defendant Borough's elected officials.

39.    Plaintiff further complained to those in attendance about the Defendants' unlawful and disparate treatment of women and other minorities who were employed or who sought employment with the Defendant Borough.

40.    Plaintiff further advised those in attendance that he intended to testify on behalf of Ms. Cruz-Smith in her federal litigation and that he did not want to be named as a Defendant in any future lawsuits resulting from the Defendants' unlawful treatment of employees or applicants based on their race, color, national origin, gender or sexual orientation.

41.    As a result of his statements, Plaintiff was advised that a conflict of interest existed between him and the other Defendants named in Ms. Cruz-Smith's federal litigation and that Plaintiff could no longer be represented by or consult with Attorney Jennings

-8-

and Attorney Manesca.

42.     Plaintiff further spoke with representatives of Scottsdale Insurance, the
Defendants' insurance carrier concerning the Defendants' unlawful treatment of Ms. Cruz-Smith
and their unlawful treatment of employees or applicants based on their race, color, national
origin, gender or sexual orientation.

43.     During the first two weeks of March, 2012, Plaintiff spoke out on
Ms. Cruz-Smith's behalf to members of the public, residents of the Defendant Borough,
other police officers, Defendant Trachta, Defendant Daugherty and members of the Defendant
Borough Council.

44.     In speaking publicly on Ms. Cruz-Smith's behalf, Plaintiff stated that
Ms. Cruz-Smith was not afforded due process nor was she afforded remedial training or
corrective action prior to being terminated.

45.     Plaintiff further stated publicly that Ms. Cruz-Smith had not engaged in
any conduct which merited termination, suspension or discipline of any kind and that the actions
taken against her were due solely to her being Hispanic/Latino and the only female officer on the
police department.

46.     On a regular weekly and sometimes daily basis, from January, 2012
through his termination, Plaintiff spoke openly and criticized Defendants hostile and unlawful
treatment of Ms. Cruz-Smith and other employees and applicants based on their race, color,
national origin, gender and sexual orientation.

47.     Plaintiff further complained that the Defendants, in dealing with
employment issues involving Ms. Cruz-Smith, had denied her due process, remedial training or

the appropriate corrective action that was afforded to other non-minority male officers.

**Speech - Officer Daniel Hall**

48.     During the 2010 calendar year, an individual named Daniel Hall (hereinafter "Officer Hall") was hired as a police officer by the Defendant Borough.

49.     Plaintiff avers that subsequent to Officer Hall's being hired as a police officer, Defendants Daugherty, Trachta, Herbst and other members of Borough Council inquired as to Officer Hall's sexual orientation.

50.     Defendants Daugherty, Trachta, Herbst and other members of Borough Council subsequently discovered that Officer Hall was the only homosexual/gay officer on the Defendant Borough's Police Department.

51.     On numerous occasions, Plaintiff overheard Defendant Herbst utter anti-gay comments and homophobic slurs against Officer Hall.

52.     Plaintiff further witnessed Defendant Herbst's wife make anti-gay comments and homophobic slurs in reference to Officer Hall.

53.     Plaintiff further witnessed Defendant Herbst make a false report of misconduct against Officer Hall in an attempt to effectuate the discipline and/or termination of Officer Hall's employment with Defendant Borough.

54.     Plaintiff spoke out against Defendant Herbst's anti-homosexual comments and homophobic slurs, to his filing a false report against Officer Hall and to the homophobic comments and slurs made by Defendant Herbst's wife.

55.     Plaintiff further verbally objected to the unlawful manner in which Defendants Daugherty and Trachta conspired with Defendant Herbst to effectuate discipline to

-10-

Officer Hall, by removing him, without cause from the police department's work schedule.

56.     In speaking out against the above-described unlawful conduct directed to Officer Hall, Plaintiff personally challenged and confronted Defendants Herbst, Daugherty and Trachta concerning their anti-gay comments, homophobic slurs and unlawful treatment and disciplining of Officer Hall solely because of his sexual orientation.

57.     Plaintiff further opposed the Defendants' unlawful treatment of Officer Hall by speaking out to other police officers, employees and residents of the Defendant Borough.

58.     Plaintiff spoke with representatives of the Northampton County District Attorney's Office concerning the Defendants' unlawful conduct directed against Officer Hall due to his sexual orientation.

<div align="center">

**Speech - Officer Joseph Nunes**

</div>

59.     In October, 2011, Joseph Nunes (hereinafter "Mr. Nunes") an individual of Hispanic/Latino descent was hired as a police officer by Defendant Borough.

60.     In November, 2011, Defendant Trachta advised Mr. Nunes that Defendant Daugherty had refused to swear in or authorize the swearing in of Mr. Nunes as a working police officer.

61.     Defendant Trachta advised Mr. Nunes that, at Defendant Daugherty's direction, additional conditions were being placed upon Mr. Nunes' employment, which included his being subjected to extensive background questions and extensive background investigation.

62.     Neither Defendant Daugherty, Defendant Trachta nor any other Mayor or Chief of Police of the Defendant Borough had ever subjected a non-minority officer to a

-11-

background investigation similar or equal to which Mr. Nunes was being subjected.

63.     In December, 2011, Plaintiff spoke openly and complained to Defendant Trachta and to other police officers, co-employees and residents of the Defendant Borough concerning the inconsistencies in the Defendants' unlawful hiring policies which were influenced by an applicant's race, color, national origin, gender and sexual orientation.

64.     In speaking openly and publicly with other police officers, co-employees and residents of Defendant Borough, Plaintiff accused Defendants Trachta and Daugherty of discriminating against Mr. Nunes because he is Hispanic and a minority.

65.     In objecting to Defendants' treatment of Mr. Nunes, including subjecting him to inappropriate questioning and inappropriate background investigation Plaintiff repeated his prior complaints and objection to the manner in which Officer Cruz-Smith had been treated by Defendants.

## Speech - Officer Connie McGinniss

66.     In July, 2012, Plaintiff spoke out against the unlawful treatment of a female police hiree named Connie McGinniss (hereinafter "Ms. McGinniss") by Defendants Trachta, Daugherty, Herbst, Matz and other members of Borough Council.

67.     Plaintiff spoke publicly against the unlawful manner in which Ms. McGinniss had been treated by Defendants, including Plaintiff's witnessing Ms. McGinniss successfully qnalify on the pistol range only to be informed by her instructor that she had failed to qualify.

68.     Plaintiff subsequently learned that the pistol range supervisor had failed Ms. McGinniss upon the explicit directive of Defendant Trachta.

-12-

69.     Plaintiff openly condemned Defendant Trachta's treatment of

Ms. McGinniss and in doing so Plaintiff repeated his prior objections to the Defendants'

unlawful and disparate treatment of employees and applicants based on their race, color, national

origin, gender and sexual orientation.

70.     In publicly opposing the Defendants' treatment of Ms. McGinniss Plaintiff

repeated his prior public comments and opposition to the manner in which the Defendants had

unjustly and unlawfully treated Officers Cruz, Hall and Nunes.

### Speech - Officer Selling Drugs

71.     During the 2009 through 2011 calendar years, Plaintiff spoke publicly on

matters of public concern which directly impacted the quality of police services and protection of

the residents of the Defendant Borough.

72.     In January of 2011, Plaintiff had participated in a two year investigation

by the Borough Police Department of the selling of narcotics in nuisance bars within the

Borough.

73.     As part of Plaintiff's investigation, he received information and later

confirmed that a police officer was involved in the selling and use of drugs in one nuisance

bar.

74.     Another officer who was involved in the investigation spoke with a

confidential, reliable informant and also confirmed the involvement of the aforesaid police

officer in the sale and use of the narcotics in the nuisance bar, however, this officer refused to file

a report containing the information received against the officer in question.

75.     Plaintiff confronted the investigating officer as to his failure to file a report

-13-

mentioning the illegal activities of the officer who had become a focus of the investigation, however, the investigating officer refused to put forth any reasons or explanation for his failure to file a full report.

76.     Plaintiff complained to Defendant Trachta concerning the lack of a proper report involving the officer in question and his illegal activity, however, Defendant Trachta refused to mandate that any full report be written.

77.     Plaintiff openly complained to Defendant Trachta and other officers in the department about the actions of his fellow officer, the decision of Defendant Trachta and the lack of a full report outlining the illegal drug activities of the officer in question in the nuisance bar.

78.     In response to Plaintiff's complaints, Defendant Trachta advised that he would not proceed on any "loose street information".

79.     Plaintiff advised Defendant Trachta that the investigation and the determination that the officer in question was involved in the selling and use of illegal narcotics was predicated upon direct testimony of a reliable, confidential informant and not the result of a "loose street information".

80.     Plaintiff subsequently obtained an audio taped statement from the reliable confidential informant, wherein the informant confirmed the information previously obtained in the investigation, including her eyewitness account of the officer in question's selling and use of narcotics.

81.     Plaintiff further arranged for the reliable confidential informant to speak directly to Defendant Trachta in a telephone conference call, at which time she again confirmed

-14-

her eyewitness account of the officer in question's selling and use of narcotics.

82.     Defendant Trachta refused to allow any report to be filed which detailed the illegal activities of the officer in question and initiated a confrontation with Plaintiff over his attempts to submit a full and comprehensive final report.

83.     During the aforesaid confrontation, Plaintiff "tossed" a file unto a file area and was disciplined  by Defendant Trachta for this benign action.

84.     The discipline imparted by Defendant Trachta was in retaliation for Plaintiff's comments to Defendant Trachta, other officers, employees and residents of the Defendant Borough and Plaintiff's insistence that Defendant Trachta file a full report concerning the illegal selling and use of narcotics by another police officer.

85.     The discipline imparted to Plaintiff by Defendant Trachta was not the result of any improper conduct by Plaintiff and was disparate discipline from that imposed upon other officers who had not demanded Defendant Trachta to file a report concerning any matter of public concern.

86.     Defendant Trachta ordered that Plaintiff be counseled and forfeit one vacation day as punishment for his "tossing" of a file unto a desk area.

87.     Defendant Daugherty, without justification, cause or a request from Defendant Trachta, intervened into the disciplining of Plaintiff and ordered that Plaintiff be subjected to more severe discipline.

88.     Prior to the inappropriate actions of the Defendant Daugherty on January 11, 2011, Defendant Trachta had entered into a written formal agreement with Plaintiff for counseling level discipline only.

89.     Defendant Daugherty misrepresented the severity of the alleged offense, ordered that written documentation of same be placed in Plaintiff's file and ordered that Plaintiff be suspended for a one day period.

90.     The actions taken by Defendants Trachta and Daugherty were a direct retaliation for Plaintiff's speaking out concerning his investigation of the officer who was involved in the illegal selling and use of narcotics in a nuisance bar and the refusal of Defendant Trachta to allow this information to be placed in a final report.

91.     Plaintiff continued to speak out against this "cover-up" of the illegal activities of a fellow officer and filed a formal grievance concerning the discipline imparted by Defendants Trachta and Daugherty.

92.     The Plaintiff's discipline was subsequently overturned by an arbitrator from the American Arbitration Association.

### Speech - Diminished Police Protection

93.     During the summer of 2011, the discharge of the responsibilities to the public by the Borough Police Department was being adversely impacted by a decision made by Defendants Daugherty and Christine Lilly, (hereinafter Ms. Lilly), the employee responsible for payroll, concerning shift differentials concerning officers working the hours between 3:00 p.m. and 7:00 a.m.

94.     Defendant Daugherty refused to authorize the proper compensation to officers for working hours that fall outside a prescribed norm and are therefore viewed as more inconvenient to work.

95.     The failure of the Defendants Daugherty to authorize the payment of this

-16-

shift differential, as mandated by the collective bargaining agreement, resulted in Defendant Daugherty's changing and limiting the hours of work for the Borough's police department and in less than twenty-four hours per day police coverage to the citizens of the Borough.

96.     Plaintiff openly objected to and criticized the actions of Defendant Daugherty and expressed concern for the residents of the Defendant Borough that diminished police service would result from Defendant Daugherty's actions.

97.     Plaintiff filed a written grievance concerning Defendant Daugherty's refusing to authorize shift differential payments, thereby causing diminished police protection for the residents of Defendant Borough.

98.     Plaintiff testified at the grievance hearings concerning the Defendants refusal to pay shift differential and the resulting diminished police protection to the Borough residents.

99.     Defendant Trachta did not respond to the initial grievance and Defendant Daugherty denied said grievance.

100.    Defendant Daugherty further attempted to intimidate Plaintiff from further appealing his decision by stating that "...the grievance is frivolous and creates a hostile and threatening relationship with Nazareth Borough, Nazareth Borough Council Members, the Secretary/Treasurer and the Mayor, both individually and collectively and **should be referred to legal counsel in any subsequent communications with regard to this grievance**." (*emphasis added*)

101.    Plaintiff filed an appeal concerning the shift differential payments to the Nazareth Borough Police Committee, chaired by Defendant Stoudt, however, said appeal was

-17-

denied.

102.    On a regular, weekly and at times daily basis, Plaintiff complained to other police officers, employees and residents of the Defendant Borough about Defendant Trachta's failure to act and to the reckless actions of Defendants Daugherty and Stoudt, which resulted in diminished police protection to the Borough.

### Plaintiff's Petition - Shift Differential - Diminished Police Protection

103.    In addition to speaking out with the public, the media, other employees, and residents of the Defendant Borough concerning the diminished protection to the public caused by the Defendants' refusal to pay the shift differential, Plaintiff filed a grievance asserting that Defendants' actions violated the Defendant Borough's collective bargaining agreement with the Association.

104.    Plaintiff further requested binding arbitration on this issue.

105.    As a direct retaliation against Plaintiff for his public speech and filing of a petition/appeal challenging the Defendants' refusal to pay a shift differential, Paul Kokolus (hereinafter "Mr. Kokolus) a supervisory/management level employee of the Defendant Borough holding the position of Secretary/Treasurer, in violation of Pennsylvania Act 111, sent Plaintiff an e-mail setting forth a proposal for the Defendant Borough to contract police services from the Colonial Regional Police Department.

106.    Plaintiff's complaint about the aforesaid Act 111 violation was transmitted through the Fraternal Order of Police to the Defendants by and through Mr. Kokolus.

107.    In June, 2011, the Defendant Daugherty denied Plaintiff's grievance concerning the payment of shift differential and Plaintiff filed an appeal concerning said

-18-

grievance and the action taken by Defendant Daugherty.

108.    In June, 2011, Plaintiff received an e-mail from Defendant Trachta outlining an encounter and conversation that Defendant Trachta had with Defendant Daugherty.

109.    Defendant Daugherty advised Defendant Trachta that Borough Council refused to give the Sergeant's Exam in order to preclude any possibility that Plaintiff would be promoted to the rank of Sergeant.

110.    Defendant Trachta cautioned Defendant Daugherty that denying a promotion or an opportunity to be promoted due to personal animus is improper, illegal and could subject those involved to legal challenge.

111.    Defendant Daugherty responded to Defendant Trachta by stating that he and Borough Council were "sick of the grievances" being filed by Plaintiff.

112.    On June 16, 2011, a hearing was held concerning Plaintiff's appeal of the grievance over shift differential payments.

113.    On June 19, 2011, Mr. Kokulas sent a second letter to Plaintiff concerning the proposed contracting of police services from the Colonial Regional Police Department and in response Plaintiff obtained the services of an attorney to represent the union concerning this issue.

114.    Plaintiff further testified as the sole witness at the arbitration concerning the issue of the shift differential payments.

115.    As a result of the Plaintiff's testimony, the arbitrator determined that "... the Borough violated the collective bargaining agreement by failing to pay shift differential" and ordered that the appropriate shift differential be paid to officers working the hours between

-19-

3:00 p.m. and 7:00 a.m.

## Plaintiff's Other Protected Activities

116.    In addition to speaking publicly and filing petitions, grievances and appeals over the Defendants' scheduling of overtime and refusal to pay shift differentials, Plaintiff engaged in other protected activity which was a substantial and motivating factor in the Defendants' retaliation against him.

117.    During the course of his employment, Plaintiff further spoke out against and took written exception to the Defendants' attempt to implement a "Workplace Harassment Policy" and "Employees Standard of Conduct" which violated Pennsylvania Act 111.

118.    During the course of his employment, Plaintiff testified in court related proceedings against friends and/or relatives of Defendants Stoudt and Herbst.

119.    During the Summer and Fall of 2009, Defendant Daugherty sought Plaintiff's support for candidacy for mayor of the Defendant Borough.

120.    Plaintiff advised Defendant Daugherty and his representatives that he would not support the Daugherty mayoral candidacy notwithstanding Plaintiff's prior active support of the candidacy of Earl Keller.

121.    Defendant Daugherty was aware of Plaintiff's refusal to support his candidacy.

122.    During the period of his employment with the Defendant Borough, Plaintiff, while pursuing his duties and responsibilities as a police officer, participated in investigations which resulted in conflicts of interest between Plaintiff and individual members

of Borough Council.

### Conflict - Defendant Stoudt

123.    From July, 2009, until the date of the illegal termination of his employment, Plaintiff openly and publicly objected to and spoke out against Defendant Stoudt's attempts to obstruct the administration of justice by officers of the Nazareth police department.

124.    In July, 2009, the Borough police arrested an individual for public drunkenness, resulting from a citizen's complaint.

125.    The individual arrested was a friend of Defendant Stoudt, who attempted to physical intercede on his behalf at the arrest location.

126.    Defendant Stoudt physically interceded on his friend's behalf at the arrest location, lifted the name tag off one officer and asked if the officers knew with whom they were speaking.

127.    Defendant Stoudt further advised the new officers that he was a member of Borough Council and he objected to the arrest of his friend.

128.    The newly hired officers arrested Defendant Stoudt's friend and contacted Plaintiff to complain that Defendant Stoudt had attempted to obstruct their performance of police duties.

129.    After receiving the complaints from the arresting officers, Plaintiff investigated the officers' complaints of obstruction by Defendant Stoudt confronted Defendant Stoudt concerning his unlawful actions.

130.    Plaintiff advised Defendant Trachta of the results of his investigation

-21-

and conversation with Defendant Stoudt and filed an official report thereon.

131.    Plaintiff reported the results of his investigation and conversation with Defendant Stoudt with Defendant Trachta, who, at the time, was Corporal Second in Command and further filed a report with then Chief of Police, Michael Sinclair.

132.    In response to the actions taken by Plaintiff, Defendant Stoudt attempted to revoke Plaintiff's permanent civil service status.

133.    During the period from July, 2009, until Plaintiff's termination by the Borough, Plaintiff witnessed, opposed and spoke out against numerous attempts by Defendant Stoudt to obstruct the administration of justice by Nazareth police officers.

134.    On another occasion, Plaintiff attempted to bring criminal prosecution against Defendant Stoudt for his illegal conduct and obstruction of justice and forwarded documentation from his investigations of Defendant Stoudt to the White-Collar Crime, Chief Prosecutor for the Northampton County District Attorney's Office.

135.    Plaintiff spoke openly to other police officers, Borough employees and Borough residents concerning Defendant Stoudt's improper conduct and Plaintiff's attempts to initiate a criminal prosecution against Defendant Stoudt.

136.    The District Attorney's Office indicated that, at that time, they would not authorize filing criminal charges against Defendant Stoudt.

137.    Plaintiff publicly condemned Defendant Stoudt's attempts to obstruct justice, asserted that Defendant Stoudt should be prosecuted criminally for his actions and spoke openly concerning this matter with other police officers and employees of the Defendant Borough and with friends and colleagues of Defendant Stoudt.

-22-

138.    As a direct result of the actions of the Plaintiff, however, the investigation into the improper conduct of Defendant Stoudt continued subsequent to the initial determination of the District Attorney's Office in June, 2011.

139.    Defendant Stoudt was aware of Plaintiff's public statements, police investigation and attempts to obtain a criminal prosecution against Defendant Stoudt by the Northampton County District Attorney's Office.

140.    Subsequent to Plaintiff's contacting the Northampton County District Attorney's Office, the Pennsylvania State Police investigated another attempt by Defendant Stoudt to obstruct justice and criminal charges were eventually filed against Defendant Stoudt.

141.    On another occasion, Plaintiff issued a warning letter to another close personal friend of Defendant Stoudt, concerning violations of the Borough's ordinances.

142.    Defendant Stoudt intervened on his friend's behalf.

143.    Plaintiff subsequently filed summary offenses against Defendant Stoudt's friend, who was subsequently found guilty on the charges.

144.    Plaintiff subsequently filed additional summary offenses for ordinance violations against Defendant Stoudt's friend.

145.    Officer Peter Swan arrested another personal friend of Defendant Stoudt, who unsuccessfully attempted to intercede on his friend's behalf and to pressuring Officer Swan into voiding the arrest.

146.    Subsequent to this arrest the Borough Council voted not to permanently employ Officer Swan and Defendant Stoudt failed to recuse himself and participated in the hearing and voted against Officer Swan's continued employment by the Borough.

-23-

147.    Plaintiff immediately and publically challenged and criticized Defendant

Stoudt for his failure to disclose his attempted intervention on his friend's behalf and his conflict

of interest with Officer Swan resulting from the arrest of Defendant Stoudt's personal friend.

148.    In February, 2011, Plaintiff issued a traffic citation to the same

personal friend of Defendant Stoudt to whom he issued warning letters on May 13, 2010 and

filed summary offenses in August, 2010.

149.    Upon learning of Plaintiff's most recent traffic arrest of his friend,

Defendant Stoudt stated that "Fred Lahovski won't have his job for long".

150.    On May 4, 2011, Defendant Stoudt testified on behalf of his friend

at a summary appeal hearing before the Honorable Leonard Zito, in the Court of Common Pleas

of Northampton County.

151.    As part of his testimony on behalf of his friend, Defendant Stoudt

accused Plaintiff of police misconduct in the arrest of his friend.

152.    Despite Defendant Stoudt's testimony, his friend was found guilty.

153.    Subsequent to said hearing Defendant Stoudt, in referring to Plaintiff

stated that Defendant Stoudt stated that Plaintiff "will have his day" and that Defendant

Stoudt "had unfinished business" with Plaintiff.

154.    On June 30, 2011, Defendant Stoudt sat as the Chairman of the

Grievance hearing over the shift differential grievance filed by Plaintiff.

155.    On July 1, 2011, Defendant Stoudt denied the shift differential grievance

filed by Plaintiff.

156.    The Plaintiff appealed Defendant Stoudt's decision and on January 10,

-24-

2012 and an arbitrator reversed Defendant Stoudt's decision and found the Defendant Borough to be in violation of the collective bargaining agreement concerning the payment of shift differential.

## Conflict - Defendant Herbst

157.   In June, 2010, Defendant Herbst filed a false report against Officer Hall wherein he alleged that Officer Hall lied on a police report.

158.   Plaintiff was assigned to conduct an investigation concerning the charges brought by Defendant Herbst. Plaintiff's investigation concluded that Defendant Herbst's charges were false.

159.   As a result of Plaintiff's investigation Officer Hall was exonerated.

160.   On June 29, 2011, Plaintiff issued a citation to Defendant Herbst's son for having improperly tinted windows.

161.   In preparation for a hearing on the summary traffic offense involving his son, Defendant Herbist advised Defendant Trachta that he would be representing his son at the magisterial hearing.

162.   Defendant Herbst further demanded that Defendant Trachta provide him with all of Plaintiff's medical records and stated that his receipt of these records was necessary for his son's defense of the citation.

163.   Magisterial District Justice John C. Capobianco dismissed the citation because it was a first offense and in reliance upon Defendant Herbst's son representation that he would immediately bring his vehicle into compliance concerning the tint of the vehicle's windows.

-25-

164.    Plaintiff did not oppose Magisterial District Justice Capobianco's

decision.

165.    Subsequent to the aforesaid hearing and decision of Magisterial District

Justice Capobianco, Defendant Herbst appeared before Defendant Trachta and repeated his

demand to have access to all of Plaintiff's medical records.

166.    Plaintiff advised Defendant Trachta that he would institute legal action if

Defendant Trachta complied with Defendant Herbst's unlawful demand to review

Plaintiff's medical records and as a result, Defendant Trachta did not comply with Defendant

Herbst's demand.

167.    Solely as a result of Plaintiff's threat of litigation, Defendant Trachta

did not comply with Defendant Herbst's demand.

## Conflict - Defendant Kopach

168.    In December, 2009, the Nazareth Police Department received

complaints of illegal dumping on an area known as the ESSROC property.

169.    Plaintiff was assigned to investigate these complaints and to ascertain the

identity of the violator.

170.    Plaintiff completed a full investigation in to the aforesaid illegal dumping

and advised Defendant Trachta that Defendant Kopach was the "only suspect" and the individual

responsible for the illegal dumping.

171.    Defendant Trachta advised Defendant Kopach of the results of Plaintiff's

investigation including Plaintiff's conclusion that Defendant Kopach was the individual

responsible for the illegal dumping.

-26-

172. Defendant Trachta advised Defendant Daugherty and other members of Borough Council, named Defendants herein, of the results of Plaintiff's investigation, including that Defendant Kopach had violated the Pennsylvania Crimes Code by illegally dumping garbage on the ESSROC Property.

173. Defendant Kopach was aware of the Plaintiff's investigation prior to voting to refuse to administer the Sergeant's Civil Service Test, in order to preclude Plaintiff from attaining the rank of sergeant.

174. Defendant Kopach was aware of Plaintiff's investigation prior to participating in the council hearing on August 27, 2012 and prior to voting to terminate Plaintiff's employment.

175. Defendant Kopach had a conflict of interest with Plaintiff which mandated his recusing himself from any vote concerning the disciplining of Plaintiff or any decision not to administer the sergeant's exam intended to preclude Plaintiff from attaining the rank of sergeant in the Nazareth Police Department.

176. Defendant Kopach had a conflict of interest with Plaintiff which mandated his recusing himself from any vote concerning Plaintiff's employment with the Nazareth Police Department.

177. Defendant Kopach failed to disclose his conflict of interest with Plaintiff prior to voting not to administer the sergeant's exam in order to preclude Plaintiff from attaining the rank of sergeant in the Nazareth Police Department.

178. Defendant Kopach failed to disclose his conflict of interest with Plaintiff prior to participating in the council hearing on August 27, 2012, concerning the termination of

-27-

Plaintiff's employment.

179.    Defendant Kopach failed to disclose his conflict of interest with Plaintiff prior to voting to terminate Plaintiff's employment.

## Conflict - Defendant Maurek

180.    In January, 2012, Defendant Maurek, a member of the Police Committee was investigated by Plaintiff for urinating in full view of the public in the parking lot of a public park.

181.    During the course of Plaintiff's investigation, Defendant Maurek admitted to Plaintiff that he committed the act and claimed to be suffering from have early onset of dementia.

182.    Defendant Maurek agreed to remove himself from the Police Committee if the police agreed not to prosecute him on these charges.

183.    Plaintiff was instructed not to file charges, however, Defendant Maurek was angered by Plaintiff's investigation and recommendation that criminal charges should be filed against Defendant Maurek.

## Conflict - Defendant Werner

184.    In July, 2009, Plaintiff confronted and warned Defendant Werner concerning her motor vehicle violation for obstructing traffic.

185.    Defendant Werner was angry at Plaintiff and resented his filing the motor vehicle charges against her.

186.    Plaintiff investigated and filed drug and DUI related charges against Defendant Werner's nephew.

-28-

187. Defendant Werner became infuriated over the Plaintiff's investigation and his arrest of her nephew on the aforesaid drug related charges.

188. Defendant Werner initially retaliated against Plaintiff by voting against Plaintiff's transfer from probationary status to permanent status as a Nazareth police officer.

189. Defendant Werner further retaliated against Plaintiff by participating in the Defendant Borough's refusal to administer the sergeant's exam to Plaintiff and by supporting the Defendants' demotion of Plaintiff from the detective position.

190. Defendant Werner further retaliated against Plaintiff by voting in favor to terminate Plaintiff.

191. Plaintiff, as a public employee and a representative of the Association had the fundamental right petition the government for the redress of grievances and thereby to file the appropriate grievances and appeals.

192. On January 10, 2012, an arbitration award was entered concerning the appeal filed by Plaintiff over the shift differential and the arbitrator found that the Defendant Borough was in violation of its collective bargaining agreement with the Association concerning shift differential payments.

193. On January 16, 2012, Defendant Daugherty advised Defendant Trachta and other members of Borough Council that he disagreed with the arbitrator's decision and stated that he would make the corrections to the police staffing as he saw fit.

194. On January 18, 2012, Defendant Daugherty directed Defendant Trachta to change the police working hours and precluding officers from relieving or filling in for officers who were unable to report for work.

-29-

195. On January 19, 2012, Defendant Trachta asked Defendant Daugherty to reconsider his directive changing the working hours and Defendant Daugherty responded that "clearly, I am well within my authority to implement the changes I have ordered ...you further proffer the threat of grievance and litigation ... my direct order to you is to implement the changes to the shifts".

196. On January 25, 2012, Defendant Trachta advised the members of the police department that the new schedule, as per Defendant Daugherty's directive "may result in gaps in the schedule causing the on-duty officer to turn the Borough over the Pennsylvania State Police at times".

197. Plaintiff openly opposed and spoke out against Defendant Daugherty's directive which resulted in less and/or inadequate police protection for the residents of the Defendant Borough.

198. Plaintiff objected about the Mayor's directive, directly to Defendant Trachta, other police officers and residents of the Defendant Borough.

199. On February 2, 2012, Defendant Trachta requested permission for Plaintiff to attend a pistol armoers course to enable Plaintiff to repair police pistols.

200. At a council meeting on that date Defendant Herbst stated that Plaintiff should not be the one to attend this course because of the "uncertainty" over how much longer Plaintiff would be employed by the Defendant Borough.

201. During the aforesaid council meeting Defendant Maurek stated that he "didn't like" to use the word "detective" in addressing Plaintiff.

202. In February, 2012, Defendant Daugherty ordered the removal of a

-30-

television set from the police department.

203.    Defendant Daugherty's removal of the television set was widely criticized by Plaintiff and other police officers because the police utilized said television to obtain information concerning breaking news, school shootings, school lockdowns, bank robberies and other incidents involving violence, weather and public safety related information.

204.    On February 7, 2012, Defendant Trachta advised Plaintiff that, as per the directive of Defendant Daugherty, Plaintiff was prohibited from continuing to discuss the removal of the television from the police department with any members of the press, media, officers, employees or residents of the Defendant Borough.

205.    Plaintiff's filing of petitions, grievances and appeals continued to anger Defendant Daugherty.

206.    On February 8, 2012, Defendant Daugherty wrote a letter to NBC, Channel 10 and the Express-Times Newspaper, wherein he stated "the Nazareth Borough Police Association has ignored multiple attempts to communicate with Borough officials and filed numerous grievances, which are forced on the Borough".

207.    Plaintiff was the primary member of the Association who filed grievances and appeals during the period from July, 2008 through February 8, 2012.

208.    On February 16, 2012, Plaintiff filed a grievance in response to the time shift change ordered by Defendant Daugherty on January 18, 2012, resulting in diminished police protection to the residents of the Defendant Borough.

209.    On February 21, 2012, Defendant Daugherty responded to the aforesaid grievance by stating "...an unfortunate consequence of grievances filed by the Nazareth Borough

-31-

Police Association in changing the original contract has created a confusing and snowballing effect on the administration of the police contract..."

210.   On February 28, 2012, Defendant Trachta spoke with Plaintiff and attempted to convince Plaintiff to resign his position as a police officer for the Defendant Borough.

211.   During this conversation Defendant Trachta informed Plaintiff that Defendant Daugherty and Borough Council were planning to "dirty you up".

212.   Plaintiff responded that he had no intention of resigning.

213.   On March 5, 2012, Plaintiff filed an appeal to the prior grievance concerning the change of the scheduled work hours by Defendant Daugherty.

214.   On March 8, 2012, Plaintiff met with Defendant Daugherty to discuss the Defendant Borough's refusal to comply with the previous arbitration award.

215.   During this meeting, Defendant Daugherty advised Plaintiff that he did not agree with the recent arbitration award concerning shift differential and that he wanted to speak to Plaintiff about resolving this issue in a manner that was more satisfactory to him.

216.   Plaintiff advised Defendant Daugherty that he was not authorized to negotiate changes in the police contract or directives mandated by the arbitration award.

217.   Defendant Daugherty was angered by the Plaintiff's response and on March 13, 2012, issued a written statement objecting to Plaintiff's insistence that the Defendant Borough honor the arbitration award.

218.   Defendant Daugherty further stated on March 13, 2012, "based on a position of refusal to discuss the grievance ...the Nazareth Borough Police Association has shown

-32-

it is unwilling to communicate with Borough officials. The refusal of the Association to open an avenue of dialogue with Borough officials is unacceptable. This leaves Nazareth Borough with an unmanageable department with regard to labor issues. As Mayor the decision I have to make is oue which is not only repulsive but also goes against ...what has been a short-sighted and incomplete and vague award to the Nazareth Borough Police Association".

219.     On March 13, 2012, Defendant Daugherty reluctantly and angrily directed Defendant Trachta to implement the shift schedule mandated by the arbitration award.

220.     Defendant Daugherty retaliated against the Plaintiff by appearing at a council meeting and requesting to go into dark/executive session in order to discuss Plaintiff's position as a detective with the Nazareth Police Department.

221.     During the executive session, Defendant Daugherty advised all council members present that Daugherty intended to eliminate the position of detective in order to punish Plaintiff for Plaintiff's protected activity, especially his filing of petitions/grievances and for Plaintiff's speech, which involved matters of public concern.

222.     The members of Borough Council and the Borough Solicitor knew or should have known that the Defendant Daugherty's action in subjecting the Plaintiff to discipline and/or an unwarranted, adverse employment action as a result of Plaintiff engaging in protected activity violated Plaintiff's rights.

223.     The Borough Council took no action to challenge or prevent the Plaintiff's removal from the detective's position by Defendant Daugherty and on the contrary, Borough Council voted to provide the necessary funding and authorization to defend and challenge Plaintiff's appeal of his removal from the position of detective.

-33-

224.    On March 16, 2012, Plaintiff received a telephone call from Defendant Trachta advising him that, as per the directive of Defendant Daugherty, Plaintiff was being removed as a detective with the Nazareth Police Department and being denied access to his office, the evidence room, the equipment room and to the records management system.

225.    The removal of the Plaintiff's detective position was a direct violation of Pennsylvania Act 111 governing the Borough and its police department and was a direct retaliation against the Plaintiff for his engaging in the above-described, protected, First Amendment activity.

226.    The removal of Plaintiff's detective position had an adverse and debilitating affect on the morale of the Borough police officers and served to further diminish the policing service offered by the Borough to its residents.

227.    Plaintiff openly objected to the removal of his detective's position during his numerous discussions with other police officers, employees and residents of the Defendant Borough.

228.    Plaintiff spoke publicly with other officers employees and residents of the Defendant Borough and asserted that the action of Defendant Daugherty and the other named Defendants was a direct retaliation against Plaintiff and an attempt to intimidate other employees and residents from imposing the actions of Defendant Daugherty and the other Defendants named herein.

229.    In response to the illegal removal of his detective position by Defendants, Plaintiff filed a written complaint/charge of unfair labor practice with the Pennsylvania Labor Relations Board.

-34-

230.    Plaintiff testified at the hearing before the Pennsylvania Labor Relations
Board concerning the Defendants' willful violation of the Pennsylvania Labor Relations Act.

231.    On March 19, 2012, Defendants disciplined Plaintiff for allegedly
failing to get dressed in his uniform before going on duty and for allegedly failing to notify
Northampton County Radio that he was available for assignments.

232.    On March 19, 2012, Plaintiff received a "Notice to Appear for an
Administrative Interview" in Defendant Daugherty's office on April 3, 2012, regarding an
incident alleged to have occurred on February 12, 2012.

233.    On April 3, 2012, Plaintiff appeared for the "Administrative Interview"
with Defendant Daugherty and the aforesaid interview was audio taped without Plaintiff's
consent and despite Plaintiff's protests.

234.    On April 12, 2012, Plaintiff complained to Defendant Trachta concerning
the hostile and illegal treatment of members of the police department who were being deprived
due process and being discriminated against by the Defendants solely due to their race, gender
and sexual orientation.

235.    Defendant Trachta responded to Plaintiff's complaints in an angry and
hostile manner and threatened Plaintiff that "you're gonna get hurt if you don't stop with all the
grievances".

236.    Plaintiff advised Defendant Trachta that he was going to call the
Northampton County District Attorney concerning his threats and Defendant Trachta responded
by ordering Plaintiff to sit in a stationery police vehicle.

237.    On April 12, 2012, Plaintiff was ordered by Defendant Trachta to appear

-35-

in Defendant Daugherty's office.

238.    Plaintiff appeared in Defendant Daugherty's office  at which time Defendant Trachta characterized Plaintiff's complaints of discrimination against officers of the Nazareth Police Department and his statement of his intention to call the District Attorney's Office amounted to "misconduct" for which Defendant Trachta requested Defendant Daugherty to suspend the Plaintiff.

239.    On April 12, 2012, Defendant Daugherty, without conducting any investigation or questioning Plaintiff concerning his version of the events, suspended Plaintiff without pay until the next meeting of Borough Council.

240.    On April 14, 2012, Defendant Trachta authored a written document entitled "...Recommendation of Penalties " concerning Plaintiff and alleges "the undersigned stated to PO Lahovski he really needs to stop this kind of behavior before he gets hurt ... PO Lahovski became very upset and stated that he has been reporting all kinds of wrong doing an criminal acts being committed by different members of the Nazareth Borough Police Department at night and on the weekends for some time and the undersigned did nothing about it... the undersigned feels that PO Lahovski is intentionally making things harder than they have to be... PO Lahovski took it upon himself to make arrangements to go to Northampton County Juvenile Probation in regards to an old case from June, 2011, in order to avoid the Mayor's appointment".

241.    Defendant Trachta's recommendation of penalties was made available to Defendant Daugherty and Borough Council and its contents were disseminated  to other police officers, employees and residents of Defendant Borough.

242.    On April 27, 2012, Defendant Trachta issued a "Performance Report for

Employee" to Plaintiff for the employment period of January 1, 2011 through December 31, 2011, which contained false and defamatory information.

243.    Defendant Trachta's false report states in part "...There is an open investigation where Detective Lahovski is the subject of a hostile work environment that is yet to be closed. There is also an investigation where Detective Lahovski is the subject of a formal complaint, both incidents are being investigated by an outside agency".

244.    Contrary to Defendant Trachta's false and defamatory statements, Plaintiff was not named in any civil or criminal court proceedings nor was he given an opportunity to discuss the Performance Report with Defendant Trachta or any representative of the Defendants.

245.    Defendants disseminated Defendant Trachta's false allegations to other police officers, employees and residents of Defendant Borough.

246.    Plaintiff was never afforded a proper opportunity to be heard or a name-clearing proceeding concerning Defendant Trachta's false allegations, as described above.

247.    On May 3, 2012, Borough Council initiated a Fact and Conclusions of Law hearing concerning Plaintiff.

248.    On May 7, 2012, pursuant to a motion made by Defendant Herbst and seconded by Defendant Stoudt, Borough Council unanimously voted to uphold a suspension of Plaintiff for ten (10) regularly scheduled shifts.

249.    Prior to unanimously voting to suspend Plaintiff, Borough Council disseminated and discussed information concerning Plaintiff which was false and misleading and never afforded Plaintiff an opportunity to be heard or to clear his name.

250.    On May 8, 2012, Defendant Trachta advised Plaintiff that Borough

-37-

Council had rescinded his suspension, however Plaintiff was never given back pay nor was the rescinded suspension deleted from his personnel file.

251. On May 14, 2012, Pat Labar, an employee of the Defendant Borough, advised Plaintiff that Defendant Trachta had interviewed her concerning an allegation made by Mr. Kokolos that Plaintiff had attempted to steal a vacuum from the police department.

252. Ms. Labar advised Defendant Trachta that Plaintiff had never attempted to steal anything and that the vacuum in question was owned by Plaintiff.

253. Defendant Trachta and Mr. Kokolus disseminated these false accusations and challenges to Plaintiff's honesty among the Defendants and other employees of the Defendant Borough and never interviewed Plaintiff or afforded Plaintiff a name cleaning hearing concerning this accusation.

254. On May 15, 2012, Plaintiff filed a grievance concerning the Defendants' assigning of overtime.

255. On May 24, 2012, Defendant Stoudt, an employee at an American Legion Post improperly entered the interior of the police department through an unlocked door while Plaintiff and another officer were interviewing a confidential informant concerning illegal drug activity at the American Legion Post where Defendant Stoudt was employed.

256. As a result of Defendant Stoudt's unauthorized entry of the police department, Plaintiff complained to Defendant Trachta and other police officers and employees of the Defendant Borough that Defendant Stoudt should be admonished if not arrested for his conduct.

257. After Plaintiff objected to Defendant Stoudt's unauthorized conduct,

-38-

Defendant Daugherty gave Plaintiff an ultimatum to resign from the Nazareth Police Department or to resign his position as Chief of Police of the Forty Fort Police Department. A copy of Defendant Daugherty's letter is attached hereto, marked Exhibit "A" and incorporated herein.

258.    In demanding that Plaintiff resign as a Nazareth police officer or resign his position as Chief of Police of the Forty Fort Police Department, Defendant Daugherty referred to a regulation entitled "Outside Employment and Other External Activities", which was passed by Borough Council on March 5, 2012. A copy of said policy is attached hereto, marked Exhibit "B" and incorporated herein.

259.    At the time Borough Council passed this employment policy, Plaintiff had already assumed the position of Chief of Police of the Forty Fort Police Department.

260.    Borough Council passed the aforesaid policy in conjunction with Defendant Daugherty's demotion of Plaintiff from the position of detective and the Defendants' attempts to remove Plaintiff from his position as a police officer.

261.    Borough Council passed the aforesaid policy as a direct retaliation against Plaintiff for Plaintiff's above-described protective activity, including his speech on matters of public concern and his filing of petitions, grievances and appeals in an attempt to communicate with the public and advance political or social issues above those of everyday employment issues.

262.    As a further retaliation against Plaintiff for his above-described protected conduct, Defendant Daugherty attempted to retroactively apply the employment policy passed on March 5, 2012, against Plaintiff.

263.    On June 3, 2012, Plaintiff advised Defendant Daugherty that he would not

-39-

resign from either position.

264. On June 7, 2012, Borough Council released Findings of Fact and Conclusions of Law concerning their executive session on May 3, 2012 and unanimous vote on May 7, 2012, to uphold the suspension of Plaintiff for ten (10) regularly scheduled shifts.

265. The aforesaid Findings and Conclusions of Law were predicated solely on Defendant Trachta's testimony and Plaintiff was denied due process and a fair opportunity to be heard by an impartial tribunal. A copy of the aforesaid Findings of Fact and Conclusions of Law are attached hereto, marked Exhibit "C" and incorporated herein.

266. On June 11, 2012, Plaintiff filed an appeal concerning the issue of the overtime payments and the resulting diminished police protection to the residents of the Defendant Borough.

267. On June 11, 2012, Defendant Daugherty forwarded a letter to Plaintiff, wherein he referred to the employment policy passed on March 5, 2012 and listed other alleged incidents for which Borough Council "shall take action against you in your capacity as Police Officer of Nazareth Borough". A copy of Defendant Daugherty's letter is attached hereto, marked Exhibit "D" and incorporated herein.

268. On June 15, 2012, Defendant Daugherty sent another letter to Plaintiff wherein he accused Plaintiff of violating the employment policy passed by Borough Council on March 5, 2012 and setting forth other alleged incidents in order to place Plaintiff's continued employment before Borough Council. A copy of Defendant Daugherty's letter dated June 15, 2012 is attached hereto marked Exhibit "E" and incorporated herein.

269. On June 18, 2012, Plaintiff testified as the only witness at a hearing

-40-

conducted before Defendant Daugherty concerning the issue of overtime payments and diminished police capacity.

270. On June 19, 2012, Defendant Daugherty denied Plaintiff's appeal concerning the overtime issue.

271. On June 28, 2012, a hearing concerning the Plaintiff's overtime grievance/appeal conducted before the Borough Council's Police Committee and Plaintiff was the only witness who testified against the Defendants' overtime policy.

272. On July 3, 2012, Borough Council, through its Police Committee denied Plaintiff's grievance/appeal.

273. On July 5, 2012, Plaintiff filed for arbitration concerning the issue of overtime and diminished police protection.

274. On July 5, 2012, Plaintiff further filed an appeal of the discipline imparted to him by Defendants Trachta and Daugherty, resulting from an incident in the police station parking lot wherein the Plaintiff openly complained to Defendant Trachta about the unlawful and discriminatory conduct of the Defendants against Ms. Cruz-Smith, Mr. Hall, Mr. Nunes, Ms. McGinniss and other employees of the Defendant Borough.

275. On July 13, 2012, a hearing on Plaintiff's grievance was held before Defendant Daugherty and Plaintiff testified at this hearing.

276. Plaintiff was advised that a hearing before Borough Council originally set for June 25, 2012, had been continued until July 16, 2012.

277. In order to properly prepare for the hearing scheduled before Borough Council on July 16, 2012, Plaintiff forwarded a request to Defendant Chiavaroli requesting

subpoenas for Defendants Daugherty and Trachta, other individuals and other items, including Plaintiff's contract with Forty Fort Borough. A copy of Plaintiff's request is attached hereto, marked Exhibit "F" and incorporated herein.

278.    Plaintiff's request to Defendant Chiavaroli was responded to by Mr. Pierce, Solicitor for Defendant Borough.

279.    Mr. Pierce's response states, in part, "Lastly, Council will require a statement which clearly explains the relevant information to be provided by the witness and any request for documents or other materials. Council reserves the right to refuse a subpoena request if it determines the information requested is not relevant or not appropriate to the proceeding". A copy of Mr. Pierce's request is attached hereto, marked Exhibit "G" and incorporated herein.

280.    As a result of the response by Borough Council, through Mr. Pierce, Plaintiff was placed in a position of having to disclose his entire defense of the charges against him to Borough Council as a condition precedent to being granted subpoena power to present his defense.

281.    As a result of the response by Borough Council, through Mr. Pierce, Plaintiff's request for subpoena power to present his defense of the charges against him was contingent upon Borough Council being apprised of the reasons for each request and determining that said reasons were relevant and/or appropriate for the disciplinary proceeding.

282.    On July 19, 2012, Defendant Daugherty described a prior grievance filed by Plaintiff as "a false claim and should be viewed as harassment".

283.    On July 19, 2012, Defendant Daugherty denied Plaintiff's grievance and appeal over the discipline imparted concerning his comments made to Defendant Trachta in

-42-

the police station parking lot.

284.     On July 19, 2012, Defendant Daugherty forwarded a letter to Plaintiff ordering Plaintiff to attend a full hearing before Borough Council wherein the Defendants were moving to terminate Plaintiff's employment. A copy of Defendant Daugherty's letter is attached hereto, marked Exhibit "H".

285.     The aforesaid hearing before Borough Council was scheduled for August 27, 2012.

286.     On August 2, 2012, at a hearing before Borough Council's Police Committee, Defendant Trachta testified that he had conducted an investigation of Plaintiff concerning an allegation that Plaintiff had not been in proper uniform before going out on patrol.

287.     Defendant Trachta testified that his investigation of the incident revealed that Plaintiff had not violated any rules or procedures and was not subject to any discipline.

288.     Defendant Trachta further testified that upon advising Defendant Daugherty of his findings, Defendant Daugherty ordered a second investigation in an attempt to impart discipline against Plaintiff for his prior conduct.

289.     On August 3, 2012, Plaintiff was interviewed by the local media wherein he discussed how the Defendants' policies had resulted in an intention erosion of police resources, manpower, facilities and equipment which had a direct impact on the safety of the residents of the Defendant Borough.

290.     On August 6, 2012, Borough Council held an executive session wherein Defendants Daugherty and Trachta offered testimony concerning alleged infractions by Plaintiff.

291.     As a result of the executive session on August 6, 2012, Borough Council

-43-

voted unanimously to suspend Plaintiff with pay from July 18, 2012 to August 6, 2012 and unanimously passed a second motion to continue Plaintiff's suspension without pay to August 27, 2012. A copy of the Borough Council's Findings of Facts and Conclusions of Law, are attached hereto, marked Exhibit "I" and incorporated herein.

292.    On August 16, 2012, Plaintiff filed for binding arbitration concerning the discipline imparted by Defendants resulting from his opposition and objection to the Defendants' above-described unlawful, hostile and discriminatory practices made to Defendant Trachta in the police parking lot.

293.    On August 17, 2012, Borough Council's Findings of Fact and Conclusions of Law were made public and/or disseminated to Plaintiff, other police officers, employees and residents of Defendant Borough.

294.    On August 25, 2012, Plaintiff forwarded a written letter to Defendant Trachta, requesting an investigation of Defendant Daugherty, including Daugherty's false statements, false reports, false testimony against Plaintiff and Daugherty's attempts to orchestrate charges of misconduct against Plaintiff.

295.    During the period from January, 2012 to August, 2012, Plaintiff's public speech and opposition to the Defendants' above-described unjust, hostile and unlawful conduct intensified.

296.    On a regular, weekly and, at times, daily basis from January, 2012 to the date of his termination hearing on August 27, 2012, Plaintiff complained to the Defendants, other officers, employees and residents of the Defendant Borough about the Defendants' hostile and unlawful treatment of employees and applicants because of their race, color, national origin,

-44-

gender, sexual orientation and/or engaging in activities protected by the First Amendment.

297. In exercising his right to free speech and objecting to the above-described hostile and unlawful conduct of the Defendants, Plaintiff regularly referred to the Defendants' unlawful treatment of officers, Cruz-Smith, Hall, Nunes, McGinniss and Plaintiff.

298. During the course of Plaintiff's employment and the period leading up to Plaintiff's termination, Defendant Borough, by and through its supervisory and management level employees, Defendant Daugherty, Defendant Trachta and the individual members of Borough Council disseminated false accusations and false information about the Plaintiff.

299. Defendants wrongful, unproven and unjust accusations against Plaintiff include, but are not limited to Defendants accusing Plaintiff of committing multiple thefts, including the theft of a vacuum cleaner Plaintiff owned, Plaintiff's impersonating the Chief of Police, Plaintiff's committing egregious violations of a code of conduct, Plaintiff's engaging in deception by scheduling an unnecessary conference with the juvenile probation officer solely to avoid a disciplinary meeting with Defendants Daugherty and Trachta, Plaintiff's "holding the Borough hostage", Plaintiff's possessing items stolen from the Borough and the false and exaggerated claims contained in Defendant Daugherty's letters to Plaintiff and Borough Council's Findings of Facts and Conclusions of Law, attached as exhibits hereto.

300. On August 27, 2012, Borough Council conducted a proceeding in executive session concerning their pre-determined plan to terminate Plaintiff.

301. Prior to proceeding in executive session, no individual member of Borough Council raised any issue of possible conflict of interest with Plaintiff nor did any member of Borough Council afford Plaintiff an opportunity to address any possible conflict of

interest and/or request the recusal of any council person from the executive session due to a conflict of interest.

302. As a result of their adversarial incidents with Plaintiff, as more fully set forth above, Defendants Stoudt, Herbst, Maurek, Werner and Kopach had a duty to raise the issue of a possible conflict of interest with Plaintiff prior to going in to executive session and voting on Plaintiff's termination.

303. Defendants Stoudt, Herbst, Maurek, Werner and Kopach had a duty to afford Plaintiff the opportunity to address the conflict of interest issues and to request that any or all of the members recuse himself or herself from the executive session and subsequent vote.

304. Defendants Donello, Chiavaroli, Matz and Fischl knew or should have known of the conflict between Plaintiff and other council members and should have acted to preclude the executive session on August 27, 2012 and/or any subsequent vote.

305. Defendants Donello, Chiavaroli, Matz and Fischl condoned, accepted, acquiesced to and/or participated in the Defendants' refusal to administer the sergeant's exam to preclude Plaintiff from attaining the rank of sergeant and in Defendant Daugherty's demotion of Plaintiff from the position of detective, in March, 2012.

306. The members of Borough Council voting on Plaintiff's termination were the same members who refused to administer the sergeant's exam in June, 2011, and who accepted, condoned, acquiesced to and/or participated in the actions of Defendants Daugherty and Trachta in demoting Plaintiff from the rank of detective in March, 2012.

307. As a result of Defendants' actions as set forth above, Plaintiff was denied a proper hearing and the opportunity to challenge the accusations against him and

-46-

produce evidence and testimony on his behalf.

308.    The executive session on August 27, 2012, was nothing more than a sham proceeding with a pre-determined outcome.

309.    On September 4, 2012, Borough Council with Defendants Trachta and Daugherty present, unanimously voted to terminate Plaintiff's employment.

310.    By Findings of Fact and Conclusions of Law dated September 5, 2012, Borough Council notified Plaintiff of its unanimous vote on September 4, 2012, to remove Plaintiff from the Nazareth Borough Police Department. A copy of the Borough Council Findings of Fact and Conclusions of Law are attached hereto, marked Exhibit "J " and incorporated herein.

311.    Plaintiff's termination was fully reported in the local media and the false and defamatory accusations forming the basis for said termination were disseminated among the police officers, employees and residents of the Defendant Borough.

312.    Plaintiff was employed as a police officer with the Defendant Borough in a position that did not require political affiliation.

313.    Plaintiff engaged in constitutionally protected conduct, including the above-described speech on matters of public concern and filing of appeals and petitions for the redress of grievances, wherein he sought to communicate with the public and to advance political or social points of view beyond the employment context.

314.    Plaintiff's conduct and protected activity was a substantial and/or motivating factor in the Defendants' decision to terminate Plaintiff.

315.    Defendants' illegal termination of the Plaintiff had a devastating negative

-47-

impact on Plaintiff's ability to maintain his position as Chief of the Forty Fort Police Department and Plaintiff subsequently resigned from said position.

316.    Defendants' illegal termination of the Plaintiff had a devastating negative impact on Plaintiff's ability to obtain other employment as a police officer in the Lehigh Valley and other communities in the Commonwealth of Pennsylvania.

317.    As a result of the Defendants' unlawful actions and retaliation against Plaintiff, Plaintiff was removed from consideration and denied the opportunity to be hired as the Chief of Police for Tatamy Borough.

318.    Plaintiff had a liberty interest in his good name, reputation, honor and integrity.

319.    Plaintiff was qualified for his position as a police officer and had a legitimate claim of entitlement to said position and to the protection of due process of law.

320.    Plaintiff's good name, reputation, honor or integrity were placed at stake because of the Defendants' unlawful actions and retaliation against Plaintiff.

321.    The Defendants publicly disseminated information which was false and defamatory in nature and had a stigmatizing and devastating effect upon Plaintiff personally and within the Nazareth and Lehigh Valley community, including the police community.

322.    Defendants deprived Plaintiff of his rights by terminating his employment with the Defendant Borough without affording Plaintiff a proper opportunity to be heard.

323.    The Defendants failed to provide Plaintiff with a name-clearing hearing.

## Defamatory Statements - Defendant Strye

324.    Defendant Strye succeeded Defendant Daugherty as Mayor of the

-48-

Defendant Borough.

325.    From the outset of his assuming position of mayor, Defendant Strye, without cause or justification, embraced and adopted a hostile and retaliatory attitude against Plaintiff.

326.    Defendant Strye publicly expressed support for and adopted the above-described unjust, hostile and unlawful retaliation against Plaintiff by his predecessor, Defendant Daugherty, Defendant Trachta, Borough Council and Defendant Borough.

327.    Defendant Strye made defamatory and slanderous public statements against Plaintiff and further stated that his negotiating with Plaintiff was the equivalent of "a fireman negotiating with an arsonist".

## Binding Arbitration

328.    Pursuant to the collective bargaining agreement between the Defendant Borough and the Association, Plaintiff filed for arbitration concerning the Defendants' failure to afford him a proper hearing, opportunity to clear his name and for subjecting Plaintiff to a unfair, illegal proceeding, wherein the outcome was pre-determined.

329.    On October 22, 2013, November 19, 2013, January 2, 2014, January 13, 2014, March 27, 2014 and April 8, 2014 hearings were held at the Defendant Borough's offices during which time Plaintiff was afforded the opportunity to present documentary and other evidence, examine and cross-examine witnesses, offer argument in support of his position and file a post-hearing brief.

330.    The aforesaid arbitration afforded Plaintiff all of the opportunities to challenge the accusations against him that were denied by the Defendants prior to and during the

-49-

executive session on August 27, 2012.

331.    As a result of the evidence produced at the aforesaid hearings the arbitrator determined that many of the disciplinary penalties initially imparted to Plaintiffs by Defendants had been reversed by other arbitrators.

332.    The arbitrators further found that the incidents cited by Defendants could not be used to support Plaintiff's termination or be considered part of a disciplinary progression.

333.    The arbitrator further found that, at the time of his termination, Plaintiff had a clean disciplinary record except for a one day vacation forfeiture in January, 2011.

334.    The arbitrator further found that, as per Defendant Trachta's testimony, Defendant Daugherty would not administer a sergeant's examination because the Defendant Borough did not want Plaintiff to obtain that position and wanted Plaintiff to resign.

335.    The arbitrator further found that, because the Defendant Borough wanted Plaintiff to resign, Defendant Trachta suggested on several occasions that Plaintiff should resign.

336.    The arbitrator referred to a prior arbitrator's decision that determined that Defendant Daugherty was targeting Plaintiff and treating him in a disparate manner.

337.    The arbitrator further determined that Defendant Daugherty "became keenly interested in seeing Lahovski's employment with the Borough end".

338.    The arbitrator further determined that the incidents Defendants Trachta and Daugherty cited to support their opinion that Plaintiff's performance had declined, "did not hold up under the scrutiny of the grievance and arbitration procedure... Rather, they suggest that the Mayor was unsuccessfully trying to hold a case for removing Lahovski from the Department."

-50-

339.    The arbitrator further determined that the Defendant Borough side-stepped any progressive disciplinary process of Plaintiff and combined all allegations into one proceeding and as such the Defendants' actions do not comport with just cause.

340.    The arbitrator concluded that "as noted by the Borough" Plaintiff was a highly motivated officer who was assigned considerable responsibility within the police department and who had no significant disciplinary record.

341.    The arbitrator further concluded that Plaintiff had no significant disciplinary record and that "He was the subject of a campaign by the former mayor to remove him from the force to the extent that another arbitrator labeled it as 'targeting' and 'disparate treatment'. He was improperly disciplined on multiple occasions as the disciplinary actions did not survive the grievance and arbitration process".

342.    The arbitrator determined that "there was no basis for four of the eight charges used to support his termination, and three of the remaining four charges, if administered in a timely manner, would have warranted relatively minor penalties ranging from counseling to no greater than a one or two day suspension".

343.    The arbitrator held that termination was not the appropriate penalty and he directed Defendants to reinstate Plaintiff to his former position, with no loss of seniority and to make Plaintiff whole for any losses incurred as a result of his discharge, including back pay and benefits from the date of his discharge to the date of his reinstatement, less interim earnings and a thirty day suspension without pay. A copy of the arbitration decision is attached hereto, marked Exhibit "K" and incorporated herein.

344.    As a further retaliation against for Plaintiff's above-described protected

-51-

activity, Defendant Borough, by and through its supervisory/management level employees, Defendant Strye and Borough Council, has refused to fully comply with the arbitration award and has further refused to make Plaintiff whole for his losses, refused to provide back pay and benefits from the date of his discharge until the present time less payment for thirty (30) days.

345.    As a further retaliation against the Plaintiff for his above-described protected activity, Defendants ordered Plaintiff to sign various documents and acknowledge and/or admit to allegations which Plaintiff previously had contested, as a condition precedent to being reinstated. Copies of the documents which Plaintiff was coerced to sign and signed under protest in order to be reinstated to his former position are attached hereto, marked Exhibit "L " and incorporated herein.

346.    Plaintiff's engaging in the above-described protected activity was a substantial and/or motivating factor in the unlawful refusal of Defendant Borough, by and through its supervisory/management level employees, Defendant Strye and Borough Council to abide by the arbitration decision dated June 30, 2014. (Attached as Exhibit"K").

347.    At all times relevant to the within action, the Defendant Borough accepted, adopted and participated in the above-described unlawful conduct and retaliation against Plaintiff by Defendant Daugherty, Defendant Trachta, Defendant Strye, Borough Council and its individual members named as Defendants herein.

## COUNT I
## PLAINTIFF V. DEFENDANT BOROUGH, BOROUGH COUNCIL, DEFENDANTS HERBST, STOUDT, MAUREK, KOPACH, WERNER DONELLO, CHIAVAROLI, MATZ, FISCHL, DAUGHERTY AND TRACHTA 42 U.S.C. 1983 - FIRST AMENDMENT

348.    Plaintiff incorporates Paragraphs 1 through 347 above as though the same

-52-

were more fully set forth at length herein.

349. Plaintiff avers that Defendant Daugherty, Defendant Trachta and Borough Council and its members named as Defendants herein, opposed and were angered by the Plaintiff's filing petitions, grievances and appeals, as more fully set forth above.

350. Defendant Daugherty advised Defendant Trachta that he and Borough Council were "sick" of Plaintiff's petitions, grievances and appeals and that Plaintiff was going to get "hurt" if he continued to file petitions, grievances and appeals.

351. Defendant Daugherty, as the Chief Executive Officer of the Defendant Borough, acting under color of State Law, including but not limited to color of any statute, ordinance, regulation, custom or usage and motivated by prejudice against Plaintiff due to Plaintiff's exercise of his First Amendment rights, including the right to petition the government for the redress of grievances, engaged in conduct that deprives Plaintiff of his rights, privileges and/or immunities as secured by the constitutions of the United States of America and the Commonwealth of Pennsylvania and the applicable statutes and case law therein.

352. Plaintiff avers that the Defendant Daugherty's conduct as set forth above, was in direct and illegal retaliation for the Plaintiff's exercising his rights under the First Amendment.

353. Defendants Trachta, Borough Council and its individual members named as Defendants herein accepted, adopted and participated in the Defendant Daugherty's unjust and unlawful conduct and retaliation against Plaintiff.

354. Defendant Borough has adopted and accepted the unlawful actions and policies of Defendant Daugherty, Defendant Trachta, its supervisory and management level

-53-

employees and Borough Council and has created, aided, condoned, acquiesced to or participated in the aforesaid illegal discriminatory conduct.

355.     Defendants have had an official policy or custom of engaging in retaliation against citizens who are employed by or seek employment with Defendant Borough and who exercise their First Amendment rights.

356.     The aforesaid policy and custom in retaliating against employees or citizens seeking employment with the Defendant Borough who exercise their First Amendment rights was a direct and proximate cause of the deprivation of the Plaintiff's rights and his resulting injuries and damages.

357.     As a result of the aforesaid actions of the Defendants, Plaintiff has sustained and will continue to sustain damages, including mental anguish, emotional distress, embarrassment, humiliation, outrage, the loss of wages, back pay, front pay, pension and medical benefits.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiff the following relief:

A.     A declaration that Defendants have violated Plaintiff's civil rights;

B.     Compensatory damages in excess of One Hundred Fifty Thousand (\$ 150,000.00) Dollars;

-54-

C.      Punitive damages, as appropriate, against the individual Defendants in
        their individual capacities;

D.      Exemplary damages, as applicable;

E.      Injunctive relief, including entering an Order enjoining Defendant
        Borough, Borough Council and its individual members, Defendant
        Trachta, Defendant Strye and all supervisory and management level
        employees of the Defendant Borough from engaging in further violations
        of the right to freedom of speech and to petition the government for the
        redress of grievances and the right to procedural and substantive due
        process and equal protection of the law and directing that they undertake a
        remedial program to provide regular and periodic training to their
        employees concerning the mandates of the First and Fourteenth
        Amendments to the United States Constitution and the mandates of the
        Constitution of the Commonwealth of Pennsylvania.;

F.      Attorney's fees, costs of suit and pre-judgment interest; and

G.      Such other equitable relief as this Honorable Court should deem just and
        proper.

## COUNT II
## PLAINTIFF V. DEFENDANT BOROUGH, BOROUGH COUNCIL, DEFENDANTS HERBST, STOUDT, MAUREK, KOPACH, WERNER DONELLO, CHIAVAROLI, MATZ, FISCHL, DAUGHERTY AND TRACHTA 42 U.S.C.§ 1983 - FIRST AMENDMENT

        358.    Plaintiff incorporates Paragraphs 1 through 357 above as though the same
were more fully set forth at length herein.

359.    Plaintiff avers that Defendant Daugherty, Defendant Trachta and Borough Council and its members named as Defendants herein, opposed and were angered by the Plaintiff's exercising his right to freedom of speech on matters of public concern, as more fully set forth above.

360.    Defendant Daugherty, as the Chief Executive Officer of the Defendant Borough, acting under color of State Law, including but not limited to color of any statute, ordinance, regulation, custom or usage and motivated by prejudice against Plaintiff due to Plaintiff's exercise of his First Amendment rights, including the right to freedom of speech on a matter of public concern, engaged in conduct that deprives Plaintiff of his rights, privileges and/or immunities as secured by the constitutions of the United States of America and the Commonwealth of Pennsylvania and the applicable statutes and case law therein.

361.    Plaintiff avers that the Defendant Daugherty's conduct as set forth above, was in direct and illegal retaliation for the Plaintiff's exercising his rights under the First Amendment.

362.    Defendants Trachta, Borough Council and its individual members named as Defendants herein accepted, adopted and participated in the Defendant Daugherty's unjust and unlawful conduct and retaliation against Plaintiff.

363.    Defendant Borough has adopted and accepted the unconstitutional actions and policies of Defendant Daugherty and Defendant Trachta and of its supervisory and management level employees and has created, aided, condoned, acquiesced to or participated in the aforesaid illegal discriminatory conduct.

364.    Defendants have had an official policy or custom of engaging in retaliation

against citizens who are employed by or seek employment with Defendant Borough and who exercise their First Amendment rights.

365. The aforesaid policy and custom in retaliating against employees or citizens seeking employment with the Defendant Borough was a direct and proximate cause of the deprivation of the Plaintiff's rights and his resulting injuries and damages.

366. As a result of the aforesaid actions of the Defendants, Plaintiff has sustained and will continue to sustain damages, including mental anguish, emotional distress, embarrassment, humiliation, outrage, the loss of wages, back pay, front pay, pension and medical benefits.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiff the following relief:

A. A declaration that Defendants have violated Plaintiff's civil rights;

B. Compensatory damages in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

C. Punitive damages, as appropriate, against the individual Defendants in their individual capacities;

D. Exemplary damages, as applicable;

E. Injunctive relief, including entering an Order enjoining Defendant

-57-

Borough, Borough Council and its individual members, Defendant

Trachta, Defendant Strye and all supervisory and management level

employees of the Defendant Borough from engaging in further violations

of the right to freedom of speech and to petition the government for the

redress of grievances and the right to procedural and substantive due

process and equal protection of the law and directing that they undertake a

remedial program to provide regular and periodic training to their

employees concerning the mandates of the First and Fourteenth

Amendments to the United States Constitution and the mandates of the

Constitution of the Commonwealth of Pennsylvania.;

F.     Attorney's fees, costs of suit and pre-judgment interest; and

G.     Such other equitable relief as this Honorable Court should deem just and

proper.

## COUNTY III
## PLAINTIFF V. DEFENDANT BOROUGH, BOROUGH COUNCIL, DEFENDANTS HERBST, STOUDT, MAUREK, KOPACH, WERNER DONELLO, CHIAVAROLI, MATZ, FISCHL, DAUGHERTY AND TRACHTA 42 U.S.C. § 1983 - FOURTEENTH AMENDMENT

367.    Plaintiff incorporates Paragraphs 1 through 366 above as though

the same were more fully set forth at length herein.

368.    Defendants improperly and illegally denied Plaintiff a hearing or an

opportunity to be heard.

369.    Defendants, in violation of Plaintiff's rights as secured by the

Constitution of the United States of America and Commonwealth of Peunsylvania and the

applicable statutes and case law, have failed to contact Plaintiff or to afford him a hearing and opportunity to be heard.

370. Plaintiff had a legitimate claim of entitlement to his continued employment with the Police Department of the Defendant Borough.

371. Plaintiff had a property interest in his position as the representative and/or President of the Association, in his continued representation of the Association in enforcing its collective bargaining agreement with the Defendant Borough, in exercising his freedoms under the First Amendment and engaging in protected activity, as more fully described above, including his right to free speech and to petition the government for the redress of grievances, all of which are protected by the Fourteenth Amendment to the Constitution of the United States.

372. Plaintiff cannot be deprived of his property interest without due process of law and must be afforded a hearing.

373. Defendants have deprived the Plaintiff of both substantive and procedural due process of law by engaging in the above-described conduct.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiff the following relief:

A. A declaration that Defendants have violated Plaintiff's civil rights;

B.    Compensatory damages in excess of One Hundred Fifty Thousand
      ($ 150,000.00) Dollars;

C.    Punitive damages, as appropriate, against the individual Defendants in
      their individual capacities;

D.    Exemplary damages, as applicable;

E.    Injunctive relief, including entering an Order enjoining Defendant
      Borough, Borough Council and its individual members, Defendant
      Trachta, Defendant Strye and all supervisory and management level
      employees of the Defendant Borough from engaging in further violations
      of the right to freedom of speech and to petition the government for the
      redress of grievances and the right to procedural and substantive due
      process and equal protection of the law and directing that they undertake a
      remedial program to provide regular and periodic training to their
      employees concerning the mandates of the First, and Fourteenth
      Amendments to the United States Constitution and the mandates of the
      Constitution of the Commonwealth of Peunsylvania.;

F.    Attorney's fees, costs of suit and pre-judgment interest; and

G.    Such other equitable relief as this Honorable Court should deem just and
      proper.

## COUNT IV
## PLAINTIFF V. DEFENDANT BOROUGH, BOROUGH COUNCIL, DEFENDANTS HERBST, STOUDT, MAUREK, KOPACH, WERNER DONELLO, CHIAVAROLI, MATZ, FISCHL, DAUGHERTY AND TRACHTA 42 U.S.C.§1983 - FOURTEENTH AMENDMENT

374.    Plaintiff incorporates Paragraphs 1 through 373 above as though the same were more fully set forth at length herein.

375.    The Plaintiff had the liberty and right to follow his chosen profession as a police officer and to seek and obtain employment in this profession free from unreasonable governmental interference.

376.    The actions of the Defendants were damaging to the reputation of the Plaintiff.

377.    The actions of the Defendants violated the Plaintiff's liberty and property interests as guaranteed by the Fourteenth Amendment of the United States Constitution.

378.    Plaintiff cannot be deprived of his liberty or property interest without due process of law.

379.    Defendants have deprived Plaintiff of both substantive and procedural due process by engaging in the above-described conduct.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiff the following relief:

-61-

A.     A declaration that Defendants have violated Plaintiff's civil rights;

B.     Compensatory damages in excess of One Hundred Fifty Thousand
       ($ 150,000.00) Dollars;

C.     Punitive damages, as appropriate, against the individual Defendants in
       their individual capacities;

D.     Exemplary damages, as applicable;

E.     Injunctive relief, including entering an Order enjoining Defendant
       Borough, Borough Council and its individual members, Defendant
       Trachta, Defendant Strye and all supervisory and management level
       employees of the Defendant Borough from engaging in further violations
       of the right to freedom of speech and to petition the government for the
       redress of grievances and the right to procedural and substantive due
       process and equal protection of the law and directing that they undertake a
       remedial program to provide regular and periodic training to their
       employees concerning the mandates of the First,  and Fourteenth
       Amendments to the United States Constitution and the mandates of the
       Constitution of the Commonwealth of Pennsylvania.;

F.     Attorney's fees, costs of suit and pre-judgment interest; and

G.     Such other equitable relief as this Honorable Court should deem just and
       proper.

## COUNT V
## PLAINTIFF V. ALL DEFENDANTS
## 42 U.S.C. § 1983, 1985 - CONSPIRACY

380.    Plaintiff hereby incorporates by reference the allegations in Paragraphs 1 through 379 as though the same were more fully set forth at length herein.

381.    Defendant Daugherty, Defendant Trachta, Defendant Strye, Borough Council and its individual members as Defendants herein, in acting as aforesaid and motivated by prejudice against the Plaintiff, conspired with each other for the purpose of impeding, obstructing, hindering and defeating the due course of justice and with the intent to deny Plaintiff his right of free speech, right to petition the government for the redress of grievances, right to due process and equal protection of the law retaliated against Plaintiff for exercising said rights and Defendant Borough condoned, acquiesced to, adopted and participated in the unlawful conduct of said Defendants.

382.    Defendant Daugherty, Defendant Trachta, Defendant Strye, Borough Council and its individual members named as Defendants herein in acting as aforesaid and motivated by prejudice against Plaintiff, conspired with each other for the purpose of depriving the Plaintiff of equal protection of the law and equal privileges and immunities under the law. Defendant Borough condoned, acquiesced to, adopted and participated in the unlawful conduct of said Defendants.

383.    In furtherance and as part of this conspiracy, the Defendants committed, as overt acts, those acts set forth above, thereby causing the Plaintiff to suffer and sustain deprivations, injuries and special damages more fully set forth herein.

384.    Defendants, therefore are liable to Plaintiff under 42 U.S.C. § 1983, 1985.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiff the following relief:

    A.    A declaration that Defendants have violated Plaintiff's civil rights;

    B.    Compensatory damages in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

    C.    Punitive damages, as appropriate, against the individual Defendants in their individual capacities;

    D.    Exemplary damages, as applicable;

    E.    Injunctive relief, including entering an Order enjoining Defendant Borough, Borough Council and its individual members, Defendant Trachta, Defendant Strye and all supervisory and management level employees of the Defendant Borough from engaging in further violations of the right to freedom of speech and to petition the government for the redress of grievances and the right to procedural and substantive due process and equal protection of the law and directing that they undertake a remedial program to provide regular and periodic training to their employees concerning the mandates of the First and Fourteenth Amendments to the United States Constitution and the mandates of the Constitution of the Commonwealth of Pennsylvania.;

-64-

F.      Attorney's fees, costs of suit and pre-judgment interest; and

G.      Such other equitable relief as this Honorable Court should deem just and

proper.

## COUNT VI
## PLAINTIFF V. DEFENDANT BOROUGH
## 42 U.S.C. § 1983 - MUNICIPAL LIABILITY

385.    Plaintiff incorporates Paragraphs 1 through 384 above as though the
same were more fully set forth at length herein.

386.    At all time relevant to the within action the Defendant Borough developed
or maintained policies or customs exhibiting deliberate indifference to the constitutional rights of
its employees, those seeking employment and its citizens of Nazareth and said policies and
customs contributed to and caused the above-described violation of the Plaintiff's constitutional
rights.

387.    At all time relevant to the within action, the Defendant Borough developed
or maintained policies or customs exhibiting deliberate indifference to unjust, unlawful and
retaliatory practices by its supervisory or management level agents or employees, including
its elected officials, wherein employees or applicants for employment were denied rights and
subjected to disparate treatment solely due to their race, color, national origin, gender or
sexual orientation and retaliated against for engaging in free speech and the right to petition the
government for the redress of grievances, as protected by the First Amendment.

388.    At all times relevant to the within action, it was the policy and custom of
the Defendant Borough to encourage or permit inadequate interviewing and screening measures
by its supervisory or management level agents or employees during the hiring process for its

-65-

police officers and to inadequately train, re-train or supervise those management level or supervisory personnel responsible for hiring police officers such as officers Cruz-Smith, Hall, Nunes, McGinniss and Plaintiff.

389.    At all times relevant to the within action, the Defendant Borough failed or refused to mandate the appropriate in-service training or discipline for those supervisory or management level agents or employees who were responsible for hiring police officers and to insure that the supervisory personnel responsible for hiring police officers had never engaged in prior misconduct or civil and constitutional rights violations against citizens, employees or candidates for employment with the Defendant Borough.

390.    Defendant Borough failed to adopt policies which were necessary to avoid or prohibit misconduct, civil and constitutional rights violations as set forth herein.

391.    As a result of the defective and inadequate policies and customs described above and the failure to conduct proper screening, interviewing, training, re-training and failure to adopt the necessary and appropriate disciplinary policies, the management level employees of the Defendant Borough, including Defendant Daugherty, Defendant Trachta, Defendant Strye and Defendant Borough Council and its individual members named herein, believed that their actions would not be properly monitored and that their acts of misconduct would not be investigated or sanctioned, but rather would be tolerated.

392.    As a result of the existing policies and customs of the Defendant Borough and the wrongful and unconstitutional conduct of its supervisory and management level agents or employees, citizens have been subjected to police misconduct and civil and constitutional rights violations which pose a risk to their safety and well-being.

-66-

393.    As a result of the existing policies and customs of the Defendant Borough and the wrongful and unconstitutional conduct of its supervisory or management level agents or employees, individuals such as Plaintiff who seek employment with the Defendant Borough have been subject to civil and constitutional rights violations.

394.    At all times relevant to the within action, the Defendant Borough has adopted, participated in, condoned and acquiesced to the above-described wrongful and unconstitutional conduct of its supervisory or management level agents or employees and elected officials including Defendant Daugherty, Defendant Trachta, Defendant Strye and Borough Council and its individual members named herein.

395.    The Defendant Borough's adopting and maintaining the above-described defective and inadequate policies and customs and its failure and refusal to adopt the necessary policies demonstrated a conscious and deliberate indifference and disregard for the well-being of its citizens, employees, and those seeking employment with the Defendant Borough.

396.    The Defendant 's adopting and maintaining the above-described defective and inadequate policies and customs and its failure and refusal to adopt the necessary policies demonstrated a conscious indifference on the part of the Defendant Borough by and through its policymakers, supervisory/management level employees and legislative branch/Borough Council.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and

-67-

other wrongful conduct by Defendants and award Plaintiff the following relief:

A.   A declaration that Defendants have violated Plaintiff's civil rights;

B.   Compensatory damages in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

C.   Exemplary damages, as applicable;

D.   Injunctive relief, including entering an Order enjoining Defendant Borough, by and through its policymakers, supervisory/management level employees and legislative branch/Borough Council from engaging in further violations of the right to freedom of speech and to petition the government for the redress of grievances and the right to procedural and substantive due process and equal protection of the law and directing that they undertake a remedial program to provide regular and periodic training to their employees concerning the mandates of the First and Fourteenth Amendments to the United States Constitution and the mandates of the Constitution of the Commonwealth of Pennsylvania.;

E.   Attorney's fees, costs of suit and pre-judgment interest; and

F.   Such other equitable relief as this Honorable Court should deem just and proper.

## COUNT VII
### PLAINTIFF V. DEFENDANT BOROUGH, BOROUGH COUNCIL, DEFENDANTS HERBST, STOUDT, MAUREK, KOPACH, WERNER DONELLO, CHIAVAROLI, MATZ, FISCHL, STRYE AND TRACHTA 42 U.S.C. 1983 - RETALIATION

397.   Plaintiff incorporates Paragraphs 1 through 396 above as though the same

were more fully set forth at length herein.

398.     The Arbitration Decision exposed the Defendants' targeting of Plaintiff and that Plaintiff's engaging in the above-described protected activity was a substantial and/or motivating factor for the Defendants' unlawful conduct.

399.     The Arbitration Decision correctly concluded that many of the disciplinary penalties initially imparted to Plaintiff by Defendants had been reversed by other arbitrators.

400.     The Arbitration Decision described in detail the manner in which the Defendants had targeted Plaintiff and treated Plaintiff in a disparate manner.

401.     The Arbitration Decision further concluded that four (4) of the eight (8) charges cited by Defendants to terminate Plaintiff were baseless and three (3) of the remaining four (4) charges were, at worst, diminimus.

402.     The decision of the arbitrator angered Defendant Daugherty, Defendant Trachta, Defendant Strye and Borough Council and its individual members named herein.

403.     The Arbitration Decision ordering Plaintiff's reinstatement with back pay and other benefits infuriated Defendant Strye who previously had made public, defamatory and slanderous statements against Plaintiff, wherein he likened himself to "a fireman" and likened Plaintiff to "an arsonist".

404.     Defendant Strye, Defendant Trachta and Borough Council and its individual members named herein have further retaliated against Plaintiff by unlawfully refusing to fully abide by the June 30, 2014 arbitration decision and to pay to Plaintiff the back pay and benefits mandated by said Decision and Award.

405.     Plaintiff's engaging in the above-described protected activity was a

-69-

substantial and/or motivating factor in the willful refusal of Defendant Strye and the remaining named Defendants to fully comply with the aforesaid Arbitration Decision and Award.

406.    Defendant Borough has condoned, acquiesced to, adopted and participated in the willful and unlawful conduct of Defendant Strye, Defendant Trachta, Borough Council and its individual members named herein.

407.    As a result of the aforesaid willful and unlawful actions of the Defendants, Plaintiff has sustained and will continue to sustain damages, including mental anguish, emotional distress, embarrassment, humiliation, outrage, the loss of wages, back pay, front pay, pension and medical benefits.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiff the following relief:

        A.     A declaration that Defendants have violated Plaintiff's civil rights;

        B.     Ordering Defendants to fully comply with the Arbitration Decision and Award dated June 30, 2014 (attached as Exhibit "K");

        C.     Compensatory damages in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

        D.     Punitive damages, as appropriate, against the individual Defendants in their individual capacities;

E.      Exemplary damages, as applicable;

F.      Injunctive relief, including entering an Order enjoining Defendant
        Borough, Borough Council and its individual members, Defendant
        Trachta, the currently elected Mayor and all supervisory and management
        level employees of the Defendant Borough from engaging in further
        violations of the right to freedom of speech and to petition the government
        for the redress of grievances and the right to procedural and substantive
        due process and equal protection of the law and directing that they
        undertake a remedial program to provide regular and periodic training to
        their employees concerning the mandates of the First and Fourteenth
        Amendments to the United States Constitution and the mandates of the
        Constitution of the Commonwealth of Pennsylvania.;

G.      Attorney's fees, costs of suit and pre-judgment interest; and

H.      Such other equitable relief as this Honorable Court should deem just and
        proper.

## COUNT VIII
## PLAINTIFF V. ALL DEFENDANTS
## VIOLATION OF PENNSYLVANIA CONSTITUTION (PENDENT STATE CLAIM)

408.    Plaintiff hereby incorporates by reference the allegations in Paragraphs

1 through 407 as though the same were more fully set forth at length herein.

409.    Defendants' above-described conduct has deprived Plaintiff of his rights

pursuant to the constitution of the Commonwealth of Pennsylvania.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter

-71-

judgment in favor of the Plaintiff and against the Defendants, jointly and severally and determine that the Plaintiff has suffered the substantial and continuing injuries set forth above and that said injuries resulted from the deprivation of his civil and constitutional rights, discrimination and other wrongful conduct by Defendants and award Plaintiff the following relief:

- A.  A declaration that Defendants have violated Plaintiff's civil rights;

- B.  Compensatory damages in excess of One Hundred Fifty Thousand ($ 150,000.00) Dollars;

- C.  Punitive damages, as appropriate, against the individual Defendants in their individual capacities;

- D.  Exemplary damages, as applicable;

- E.  Injunctive relief, including entering an Order enjoining Defendant Borough, Borough Council and its individual members, Defendant Trachta, Defendant Strye and all supervisory and management level employees of the Defendant Borough from engaging in further violations of the right to freedom of speech and to petition the government for the redress of grievances and the right to procedural and substantive due process and equal protection of the law and directing that they undertake a remedial program to provide regular and periodic training to their employees concerning the mandates of the Constitution of the Commonwealth of Pennsylvania.;

-72-

F.    Attorney's fees, costs of suit and pre-judgment interest; and

G.    Such other equitable relief as this Honorable Court should deem just and

proper.

## **DEMAND FOR JURY TRIAL**

410.    Plaintiff hereby demands a jury trial on all issues of facts and damages

in this action.

Respectfully submitted,

Fredrick E. Charles, Esquire
Attorney I.D. Number 256921
Attorney for Plaintiff
441 Linden Street
Allentown, PA 18102
(610) 437-7064

EXHIBIT "A"

# BOROUGH OF NAZARETH

## COUNTY OF NORTHAMPTON

## COMMONWEALTH of PENNSYLVANIA

### 134 S. Main Street. Nazareth. P.A 18064



est. 1740

May 29, 2012

Office Frederick Lahovsky
Nazareth Borough Police Department
134 South Main Street
Nazareth, PA  18064

Dear Officer Lahovski:

It has come to the Borough's attention that you have accepted a full-time Chief of Police position at Forty Fort Borough. While this may be a great opportunity for you, it violates Nazareth Borough's employment policies and you will be required to resign the position in Forty Fort if you wish to continue your employment with Nazareth.

In the past, although Nazareth has permitted officers to work a limited number of hours in neighboring municipalities, it has never permitted anyone to accept a position as significant as Chief of Police in another municipality, nor has it permitted officers to work such a great distance from Nazareth. As you may also be aware, Nazareth recently codified this long-standing practice/policy in writing (a copy of that policy is enclosed for your convenience).

Please advise me in writing no later than Wednesday, June 6, 2012 whether you have resigned the position in Forty Fort and wish to continue your employment in Nazareth.

Sincerely,

Fred Daugherty
Mayor

Enc.

EXHIBIT "B"

# OUTSIDE EMPLOYMENT AND OTHER EXTERNAL ACTIVITIES

All regular full time employees must obtain approval from their immediate supervisors and Human Resources before accepting any outside employment. Approval will be based on possible conflict of interest, any interference with the employee's ability to perform their duties, any conduct adversely effecting the efficiency of a department, and interference with their regular working hours. Activity related to outside employment may not take place during the employee's regular hours, nor involve the use of the Borough's resources.

Any employee who wishes to serve in an advisory capacity for another organization or serve on the Board of any organization must first obtain approval from Human Resources and Borough Council. Approval will be granted based on the amount of time and type of activity involved, any interference with the employee's regular work schedule, and the benefit to the employee and the Borough.

## Outside Employment Policy

I.      Objective

In order for the Borough of Nazareth to continue to provide the best municipal services to our residents, we require the full attention and efforts of our talented employees. The Borough of Nazareth's focus on shared values, purpose and vision precludes the endorsement of employees seeking outside full time employment to supplement their Borough full time employment.

II.     Scope of Policy

All employees are required to follow this policy.

III.    Procedures

Any employee holding a job with another organization, business or municipality must always demonstrate satisfactory performance in their job responsibilities with the Borough of Nazareth. All employees will be judged by the same performance standards and will be subject to the Borough of Nazareth's scheduling demands, regardless of any existing outside work requirements.

If the Borough of Nazareth determines that an employee's outside work interferes with performance or the ability to meet the requirements of the Borough of Nazareth as they are modified from time to time, the employee may be asked to terminate the outside employment if he or she wishes to remain as an employee of the Borough of Nazareth.

Outside employment will present a conflict of interest if it has any type of negative impact or a potentially negative impact on the Borough of Nazareth.

IV.     Outside Employment Policy

Employees are permitted to engage in outside work or hold other jobs, subject to certain restrictions as outlined below.

(1)     Activities and conduct away from the job must not compete, conflict with or compromise the interests or adversely affect job performance and the ability to fulfill all responsibilities to the Borough of Nazareth. Employees are prohibited from using any of the Borough's tools or equipment.

(2)     Employees are cautioned to consider carefully the demands that additional work activity will create before accepting outside employment. Outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, leaving early, refusal to travel or refusal to work overtime or different hours. If outside work activity causes or contributes to job related problems, it must be discontinued.

(3)     In evaluating outside work, department heads and Human Resources will consider whether the proposed employment:

    A.     is a possible conflict of interest;
    B.     causes any interference with the employee's ability to perform their duties;
    C.     does conduct adversely effect the efficiency of a department; and
D.     causes interference with their regular working hours

(4)     Employees who have accepted outside employment may not use paid sick leave to work on the outside job. Fraudulent use of sick leave will result in disciplinary action up to and including termination.

(5)     Concurrent full time employment is forbidden

No Borough full time employee shall be employed as a full time employee of another entity, business or municipality. The Borough of Nazareth considers full time employment to be forty (40) hours weekly, or as determined by the individual circumstances of the employment.  Job performance, call-out availability, necessary overtime and staying beyond normal shift hours to complete emergency or critical tasks could all be adversely affected by commitments to other full time employment.

EXHIBIT "C"

# THE COUNCIL OF
# THE BOROUGH OF NAZARETH

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RE:    Suspension of Officer Frederick J. Lahovski, Jr.

The Council of the Borough of Nazareth, after conducting a hearing by executive session on
Thursday, May 3, 2012, passed a motion by unanimous vote on May 7, 2012 to uphold the
suspension without pay of Officer Frederick J. Lahovski, Jr., hereby makes the following
findings of fact and conclusions of law in support thereof:

1.    Officer Lahovski is employed as a full-time police officer by the Borough of Nazareth.

2.    On Thursday, April 12, 2012, Officer Lahovski, in a disrespectful and threatening
      manner, engaged in an argument with his superior, Chief of Police Thomas Trachta.

3.    On Thursday, April 12, 2012 Chief Trachta reported the details of the incident involving
      Officer Lahovski to Mayor Fred Daugherty and requested the Mayor suspend Officer
      Lahovski from duty for conduct unbecoming an officer.

4.    On Thursday, April 12, 2012, Mayor Daugherty suspended Officer Lahovski without pay
      until the next Borough Council meeting on May 7, 2012, effective immediately.

5.    On April 16, 2012, Chief Trachta served Officer Lahovski by U.S. certified mail a Notice
      to Appear for a Hearing, to be held Thursday, May 3, 2012, regarding his suspension.

6.    On Thursday, May 3, 2012, Borough Council held an executive session hearing. Officer
      Lahovski attended accompanied by fellow union member Officer Stephen Schlieg.

7.    Chief Trachta testified that on April 12, 2012 Officer Lahovski stopped the Chief in the
      parking lot of police headquarters to inform him of actions Officer Lahovski had
      undertaken in regards to police department equipment.

8.    Chief Trachta testified that Officer Lahovski was quickly agitated and began shouting at
      the Chief in a disrespectful and threatening manner. During the argument Officer
      Lahovski threatened to put the Chief in handcuffs.

9.    Chief Trachta testified that, in order to diffuse the situation, he was forced to order
      Officer Lahovski to sit inside a nearby police vehicle to calm himself down.

10.   Other than a general denial of Chief Trachta's testimony, Officer Lahovski offered no
      response.

11.     The Borough Council found Chief Trachta's testimony credible.

12.     The Borough Council found Officer Lahovski exhibited conduct unbecoming an officer
        by his actions toward Chief Trachta on April 12, 2012.

WHEREFORE, Council of the Borough of Nazareth upholds the suspension without pay of
Officer Frederick J. Lahovski, Jr., and sets the term of the suspension at ten regularly scheduled
shifts, with compensation to be adjusted accordingly.

Council of the Borough of Nazareth

Dated: JUNE 7, 2012                    By _____

                                       Daniel Chiavaroli, President

EXHIBIT "D"



## BOROUGH OF NAZARETH
### COUNTY OF NORTHAMPTON
### COMMONWEALTH of PENNSYLVANIA

*134 S. Main Street, Nazareth, PA 18064*

est. 1740

June 11, 2012

Officer Frederick Lahovsky
Nazareth Borough Police Department
134 South Main Street
Nazareth, PA 18064

Dear Officer Lahovski:

On May 29, 2012, I sent you a letter informing you that your maintaining the full-time position as the Chief of Police at Forty Fort Borough violates Nazareth Borough's employment policies on outside employment. See Section IV(5) of the codified employment policy ("NB Outside Employment Policy"), which is enclosed again for your convenience. As a result, I notified you that, on or before June 6, 2012, you were required to inform me in writing if you wished to resign the position in Forty Fort to continue your employment with Nazareth. To date, I have not received that writing.

In addition, during the course of your recent employment with Nazareth, you have engaged in conduct that has violated a number of different sections of Nazareth Borough's G.O. Directive 2.16.00 concerning Professional Standards (the "Directive"). The specific sections and the factual basis for each violation are as follows:

### Incident On April 12, 2012 In The Parking Lot
### Of The NBPD For Which You Were Suspended

On April 12, 2012, from approximately 0848 hours to approximately 0942 hours, you engaged in conduct when interacting with Chief of Police Trachta (the "Chief") in the parking lot of the NBPD, which violated Sections of the Directive: 1.0.1, 1.0.2, 1.0.4, 1.0.5, 3.0.1, 3.0.2, 3.0.4, 3.0.5, 12.0.1, 13.0.1, and 13.0.2. Specifically, you: (A) contacted the Aggressive Driving Enforcement and Education Program to transfer signs being stored by NB to Forty Fort Borough Police Department ("FFBPD"), all without authority or prior approval from the Chief, despite having been warned previously that such actions are outside the scope of your authority (see Sirchie Invoice described below); (B) spoke to the Chief in an insubordinate and disrespectful manner, threatened to arrest the Chief and accused the Chief of committing a crime, used obscene language and gestures, and failed to be tactful and courteous, all of which was in public; and (C) repeatedly have failed to wear your police badge on your outermost garment. For more detail concerning this incident, see the Findings of Fact and Conclusions of Law of the Council of the

Officer F. Lahovsky
June 11, 2012
Page 2

Borough of Nazareth from the May 7, 2012 hearing, which document is attached hereto.

## Sirchie Invoice

On February 6, 2012, you ordered, purchased, and/or acquired merchandise or services valued at $300.48, in the name of NB or the NBPD for personal gain, used the NBPD address as your personal address, and used without authority private equipment for official purposes. This order was placed to Sirchie under the invoice number 0068795-IN, a copy of which is attached hereto. This conduct violated the following Sections of the Directive: 8.1.4, 15.0.5 and 15.0.8.

## Violating Instructions Provided in Departmental Memo
## Dated March 21, 2012 Titled "Status of NBPD" (the "March 21 Memo")

The March 21 Memo instructs all NB Police Officers that they shall submit all incident reports before the expiration of their tours, or as soon as is practicable thereafter, which is usually the next day. On May 19, 2012, at approximately 1024 hours, you failed to write an incident report regarding a child custody case involving Kamett L. Brenner, and failed to write the incident report in the Incident Log before the expiration of your tour that night at 2000 hours. You wrote the incident report fourteen (14) days after the May 19 incident and only did so after the Chief instructed you to do so. This failure violated the following Sections of the Directive: 2.0.2, 3.0.1, 3.0.2, 5.0.12, 6.0.3, and 6.0.4.

## Failing to Timely Inform
## Northampton County Radio ("NCR") That You Were On Duty

On March 14, 2012, you began your on call shift at 0700 hours. Nevertheless, you failed to notify NCR that you were available for assignments at that time. As a result, a police call from NCR that came into NB at 0740 hours was unnecessarily diverted to the Pennsylvania State Police. When the Chief interviewed you about this incident, you admitted to having failed to timely notify NCR of your on-duty status because you were engaged in a conversation with Police Officer Ledo. This conduct violated Sections 3.0.1, 3.0.2, and 6.0.2 of the Directive.

As a result of your violation of the NB Outside Employment Policy and the cumulative impact of your violations of the specific sections of the Directive listed above, a hearing shall take place pursuant to Section 46191 of the Borough Code to determine what disciplinary action, if any, the City Council sitting as a Civil Service

Officer F. Lahovsky
June 11, 2012
Page 3

Board shall take against you in your capacity as Police Officer of Nazareth Borough. The hearing is set for June 25, 2012, at 7:00 P.M. at the Council Chambers located at the corner of W. Center St. and Church St. You may be represented by an attorney of your choice should you so desire.

Sincerely,

Fred Daugherty, Mayor

cc: Charles Ercole, Esq.

**EXHIBIT "E"**

# Borough of Nazareth

Nazareth, Pennsylvania 18064

Office of the Mayor



Colonial Hospitality Since 1740

June 15, 2012

HAND DELIVERED
Police Officer Frederick Lahovski
Nazareth Borough Police Department
134 South Main Street
Nazareth, PA 18064

REGULAR MAIL
2204 Easton Avenue
Bethlehem, PA 18017

Dear Officer Lahovski:

On May 29, 2012, I sent you a letter informing you that your maintaining the full-time position as the Chief of Police at Forty Fort Borough violates Nazareth Borough's employment policies on outside employment. See Section IV(5) of the codified employment policy ("NB Outside Employment Policy"), which is enclosed again for your convenience. As a result, I notified you that, on or before June 6, 2012, you were required to inform me in writing if you wished to resign the position in Forty Fort to continue your employment with Nazareth. To date, I have not received that writing.

In addition, during the course of your recent employment with Nazareth, you have engaged in conduct that has violated a number of different sections of Nazareth Borough's G.O. Directive 2.16.00 concerning Professional Standards (the "Directive"). The specific sections and the factual basis for each violation are as follows:

## Incident On April 12, 2012 In The Parking Lot Of The NBPD For Which You Were Suspended

On April 12, 2012, from approximately 0848 hours to approximately 0942 hours, you engaged in conduct when interacting with Chief of Police Trachta (the "Chief") in the parking lot of the NBPD, which violated Sections of the Directive: 1.0.1, 1.0.2, 1.0.4, 1.0.5, 3.0.1, 3.0.2, 3.0.4, 3.0.5, 12.0.1, 13.0.1, and 13.0.2. Specifically, you: (A) contacted the Aggressive Driving Enforcement and Education Program to transfer signs being stored by NB to Forty Fort Borough Police Department ("FFBPD"), all without authority or prior approval from the Chief, despite having been warned previously that such actions are outside the scope of your authority (see Sirchie Invoice described below); (B) spoke to the Chief in an insubordinate and disrespectful manner, threatened to arrest the Chief and accused the Chief of committing a crime, used obscene language and gestures, and failed to be tactful and courteous, all of which was in public; and (C) repeatedly have failed to wear your police badge on your outermost garment. For more detail concerning

Police Officer Frederick Lahovski
June 15, 2012
Page 2

this incident, see the Findings of Fact and Conclusions of Law of the Council of the Borough of Nazareth from the May 7, 2012 hearing, which document is attached hereto.

### Sirchie Invoice

On February 6, 2012, you ordered, purchased, and/or acquired merchandise or services valued at $300.48, in the name of NB or the NBPD for personal gain, used the NBPD address as your personal address, and used without authority private equipment for official purposes. This order was placed to Sirchie under the invoice number 0068795-IN, a copy of which is attached hereto. This conduct violated the following Sections of the Directive: 8.1.4, 15.0.5 and 15.0.8.

### Violating Instructions Provided in Departmental Memo
### Dated March 21, 2012 Titled "Status of NBPD" (the "March 21 Memo")

The March 21 Memo instructs all NB Police Officers that they shall submit all incident reports before the expiration of their tours, or as soon as is practicable thereafter, which is usually the next day. On May 19, 2012, at approximately 1024 hours, you failed to write an incident report regarding a child custody case involving Kamett L. Brenner, and failed to write the incident report in the Incident Log before the expiration of your tour that night at 2000 hours. You wrote the incident report fourteen (14) days after the May 19 incident and only did so after the Chief instructed you to do so. This failure violated the following Sections of the Directive: 2.0.2, 3.0.1, 3.0.2, 5.0.12, 6.0.3, and 6.0.4.

### Failing to Timely Inform
### Northampton County Radio ("NCR") That You Were On Duty

On March 14, 2012, you began your on call shift at 0700 hours. Nevertheless, you failed to notify NCR that you were available for assignments at that time. As a result, a police call from NCR that came into NB at 0740 hours was unnecessarily diverted to the Pennsylvania State Police. When the Chief interviewed you about this incident, you admitted to having failed to timely notify NCR of your on-duty status because you were engaged in a conversation with Police Officer Ledo. This conduct violated Sections 3.0.1, 3.0.2, and 6.0.2 of the Directive.

As a result of your violation of the NB Outside Employment Policy and the cumulative impact of your violations of the specific sections of the Directive listed above, a hearing shall take place pursuant to Section 46191 of the Borough Code to determine what disciplinary action, if any, the Borough Council should take against you in your capacity as Police Officer of Nazareth Borough. The hearing is set for June 25, 2012, at 7:00 P.M. at the Council Chambers located at the corner of W. Center St. and Church St. You may be represented by an attorney of your choice should you so desire.

Sincerely,

Fred Daugherty
Mayor

Encs.
cc: Charles Ercole, Esq.

EXHIBIT "F"



# NAZARETH BOROUGH POLICE ASSOCIATION



P.O. BOX 573 • NAZARETH, PENNSYLVANIA 18064



Mr. Daniel Chiavaroli                                        July 13, 2012
Nazareth Borough Council President
134 S. Main St.
Nazareth, PA 18064

Dear Sir,

As Nazareth Borough Council will conduct for a hearing on July 16, 2012, please receive this correspondence as a request for subpoenas pursuant to the PA Borough Code. The request for legal subpoenas with contempt provision are for the following persons:

Fred C. Daugherty Jr.
Thomas Trachta
Christine Lilly
Ben Rea
Forty Fort Borough- Chief of Police Contract for Frederick J. Lahovski
Patricia LaBar
Nazareth Borough Surveillance Cameras-All camera recordings for June 3, 2012.

Very truly yours,

*F.J. Lahovski Jr.*

Fred Lahovski. NBPA President

*recvd 7/13/13
2:52 PM
CRL*

**EXHIBIT "G"**

# Pierce & Dally, LLC

Attorneys at Law

*Alfred S. Pierce*

124 Belvidere Street
Nazareth, Pennsylvania 18064-2114

Phone: 610-759-1420
Fax:    610-759-5892

aspierce@piercedally.com

July 16, 2012

Officer Frederick J. Lahovski, Jr.
Nazareth Borough Police Department
134 S. Main Street
Nazareth, PA  18064-2199

Dear Officer Lahovski:

As solicitor to the Borough of Nazareth, I am providing you with this letter as notice that your disciplinary hearing scheduled for Monday, July 16, 2012, has been continued on your request. This letter is notice to you that the hearing is rescheduled for August 13, 2012, at 7:00 p.m. at the Nazareth Borough Hall. No continuance will be granted unless you provide written notice to the Council with a satisfactory explanation of the necessity for further extension of time to proceed with your disciplinary matter.

Council is also in receipt of your request dated July 13, 2012, for the issuance of subpoenas. In response to your request, please be advised that this is the Borough's procedure for requesting subpoenas. You must utilize the format that is attached to this letter to identify the person to whom the subpoena will be issued, as well as the identification of the person or attorney requesting the subpoena. In addition, Council will require an adequate address for the person being subpoenaed to enable delivery by certified mail of the subpoena.

Lastly, Council will require a statement which clearly explains the relevant information to be provided by the witness and any request for documents or other materials.  Council reserves the right to refuse a subpoena request if it determines that the information requested is not relevant or not appropriate to the proceeding.

Very truly yours,

PIERCE & DALLY, LLC

BY:

Alfred S. Pierce, Esquire

ASP:mw

EXHIBIT "H"

**BOROUGH OF NAZARETH**
COUNTY OF NORTHAMPTON
COMMONWEALTH of PENNSYLVANIA
*Fred C. Daugherty Jr. - Mayor*
*134 S. Main Street, Nazareth, Pa 18064*



est. 1740

July 19, 2012

To: Frederick J. Lahovski Jr.
   C/O Nazareth Borough Police Association
Re: Grievance Dated March 19, 2012

Mr Lahovski,

On Friday July 13, 2012 a hearing was held in the Mayor's office in the Borough of Nazareth. Present were Fred Lahovski, Steven Schleig and Mayor Fred Daugherty. The hearing convened at 11:02 am. Your grievance as stated on the form provided listed the date of the alleged violation and claims discipline without just cause.

You noted having not received a response from Chieft Trachta to your grievance and stated you would not waive any procedural motions in processing your grievance. You did not receive a satisfactory response from Chief Trachta, therefore proceeded with section 11, subsection 3 with requesting a hearing with the Mayor. On this subject all procedures have been followed, therefore you have no standing for a complaint of procedure.

The actual incident you are grieving and claiming discipline without just cause occurred October 17, 2011. The facts are on that date you began your shift at approximately 3 am. Captured on the camera of the entrance to the NBPD an individual approached the door on several occasions. At a point approximately 5:49 am you came out the door into camera view. The image clearly shows you as still being dressed in the same gym style clothing you were dressed in when you first entered the building. Further, after having spoken to several witnesses who were present at a call you answered after 6 am, you were not readily identifiable as a police officer other than that you were in a police cruiser and were dressed in dark clothing.

It is my decision as Mayor of the Borough of Nazareth, your grievance has no standing or merit to a claim of discipline since you were never disciplined for your actions on this date. Simply stated, your grievance is a false claim and should be viewed as harassment.

Sincerely,

Fred C. Daugherty, Jr.

Cc: Alfred S Pierce, Solicitor
     Chief Thomas Trachta, Nazareth Borough Police

"THE
BARONY
OF THE
ROSE"

# BOROUGH OF NAZARETH

## NORTHAMPTON COUNTY
### PENNSYLVANIA
### 18064

est.1740

| BOROUGH OFFICES | 134 SOUTH MAIN STREET | 610-759-0202 |
| COUNCIL CHAMBERS | 159 WEST CENTER STREET | 610-746-0383 |

Dear Officer Lahovski:

As you know, pursuant to the Nazareth Borough Outside Employment Policy ("Outside Employment Policy"), which has been given to you several times in the past (but is enclosed again for your convenience), Nazareth Borough ("NB") prohibits its full-time police officers from: (1) working as a full-time[1] employee for another entity, business, or municipality; and (2) maintaining outside employment if that employment competes or conflicts with or compromises the interests of the Borough or adversely affects performance and the ability to perform all responsibilities to the Borough. When, in May 2012, I wrote to you to inform you that I regarded your employment in Forty Fort as full-time under the Outside Employment Policy, your only response was that the information I had was "erroneous," and that your intention was to maintain your "employment status . . . as it currently exists." Based on the information that has been made available to me, I continue to regard your employment as Forty Fort's Police Chief to be in violation of the proscriptions above.

In addition and/or as evidence that your employment at Forty Fort is adversely affecting your performance, you have engaged in conduct on many occasions during your recent employment with NB that has violated a number of different sections of NB's G.O. Directive 2.16.00 concerning Professional Standards (the "Directive"). The specific sections and the factual background for each violation are as follows:

### Incident On April 12, 2012 In The Parking Lot
### Of The NBPD For Which You Were Suspended

On April 12, 2012, from approximately 0848 hours to approximately 0942 hours, you engaged in conduct when interacting with Chief of Police Trachta (the "Chief") in the parking lot of the NBPD, which violated many different sections of the Directive. Among other things, you (a) spoke to the Chief in an insubordinate and disrespectful manner, threatened to arrest the Chief and accused the Chief of

---

[1] Pursuant to the Outside Employment Policy, NB considers "full-time" to be forty (40) hours weekly or "as determined by the individual circumstances of the employment."

committing a crime, used obscene language and gestures, and failed to be tactful and courteous, all of which was in public; and (b) repeated again (after numerous times of doing so) your failure to wear your police badge on your outermost garment. Also, during your conversation with the Chief, you admitted to having contacted the Aggressive Driving Enforcement and Education Program to transfer signs being stored by NB to Forty Fort Borough Police Department ("FFBPD"), all without authority or prior approval from the Chief, despite having been warned previously that such actions are outside the scope of your authority (see Sirchie Invoice described below). For more detail concerning this incident, see the Findings of Fact and Conclusions of Law of the Council of the Borough of Nazareth from the May 7, 2012 hearing, which document is attached hereto. Your conduct violated the following Sections of the Directive: 1.0.1, 1.0.2, 1.0.4, 1.0.5, 3.0.1, 3.0.2, 3.0.4, 3.0.5, 12.0.1, 13.0.1, and 13.0.2.

## Sirchie Invoice

On February 6, 2012, you ordered, purchased, and/or acquired merchandise or services valued at $300.48, in the name of NB or the NBPD for personal gain, used the NBPD address as your personal address, and used without authority private equipment for official purposes. This order was placed to Sirchie under the invoice number 0068795-IN, a copy of which is attached hereto. This conduct violated the following Sections of the Directive: 8.1.4, 15.0.5 and 15.0.8.

## Gruver Incident

On Sunday, July 15, 2010, at approximately 0643 hours, you were dispatched by NCR to 454 Union Street. The Pennsylvania State Police were already on the scene. You arrived at 0649 and spoke with PSP Troopers Russo and Smith, who reported that they responded to an EMS call that developed into a domestic or mental health issue. You took control over the scene from PSP. The victim, Maria Gruver, had called the 911 operator and stated that her husband, Jason Gruver, assaulted her. She was removed to the hospital with serious injuries. You interviewed Jason Gruver, after which, instead of arresting him, you allowed Mr. Gruver to go to the hospital and merely instructed him to come into NBPD after his discharge from the hospital so that you could conduct an investigation. You failed to conduct a proper investigation into this domestic assault because you: (1) sent the perpetrator to the hospital without ascertaining the facts even though a state trooper told you that the wife had been removed to the hospital with injuries; (2) failed to run Jason Gruver for warrants before releasing him to EMS (which would have uncovered an outstanding arrest warrant for assaulting his wife); (3) failed to search the house for other victims even though it was appeared that a child resided there; (4) neglected to observe or smell the marijuana that was being grown in large quantities in the house; and (5) failed to find evidence of a blood-written apology on the upstairs bathroom wall. This conduct violated the following Sections of the Directive: 3.0.1, 3.0.2, 6.0.1, and 6.0.3.

## Conduct Unbecoming In Dealings with Citizen Larry Vandever

On June 25, 2012, at approximately 1430 hours, Larry Vandever came into NB Police headquarters to lodge a citizen complaint against you. He stated that he approached you twice in or about June 2012 and both times you rudely "blew him off" and referred him to the Chief of Police for service. He stated that you told him that you would not do any more than you have to do as a police officer for NB, you did not feel it was your job to listen to him, and the Borough does not respect you. Mr. Vandever eventually produced a type-written letter concerning his complaints. If true, the way in which you treated Mr. Vandever and referred him to the Police Chief for service instead of performing your duties, as more specifically described herein, violated the following Sections of the Directive: 3.0.1, 3.0.2, 5.0.12, 5.0.15, 6.0.3, and 13.0.2.

## Report Made by Josalynn Rowlands of Possible Child Abuse

On February 12, 2012, at approximately 1111 hours, you were dispatched to a NCR call of a Check the Welfare of a child at 60 ½ S. Main Street, regarding a child crying and screaming. The reporting party was Josalynn Rowlands. Ms. Rowlands' mother, Kimberly Guerin, contacted the NBPD to lodge a complaint against you for your handling of her daughter's report of potential child abuse. Among other things, you told Ms. Rowland, when she told you she wanted to remain anonymous, that "Anonymous calls get anonymous results," and erroneously told Ms. Rowland that you would not knock on the alleged child abuser's door without telling the alleged abuser her name because to do otherwise would result in liability for the police. After you left scene, Ms. Guerin called you and personally spoke to you over the telephone to complain about your conduct. Not only did you fail to adequately address her concerns or answer her questions but, instead, you hung up on her. Ms. Guerin and Ms. Rowland were so disturbed by your lack of professionalism, your threat to identify Ms. Rowland to the alleged child abusers, and your dismissal of their concerns that Ms. Guerin contacted the State Police to request that they investigate this matter. Also, you spent only six minutes at the scene, did not properly investigate, and failed to make a records check or report this incident to Children and Youth. If true, this conduct violates the following Sections of the Directive: 3.0.1, 3.0.2, 5.0.12, 5.0.15, 6.0.1, 6.0.3, 13.0.2, and 13.0.4.

## Violating Instructions Provided in Departmental Memo
## Dated March 21, 2012 Titled "Status of NBPD" (the "March 21 Memo")

The March 21 Memo instructs all NB Police Officers that they shall submit all incident reports before the expiration of their tours, or as soon as is practicable thereafter, which is usually the next day. On May 19, 2012, at approximately 1024

hours, you failed to write an incident report regarding a child custody case involving Kamett L. Brenner, and failed to write the incident report in the Incident Log before the expiration of your tour that night at 2000 hours. You wrote the incident report fourteen (14) days after the May 19 incident and only did so after the Chief instructed you to do so. This failure violated the following Sections of the Directive: 2.0.2, 3.0.1, 3.0.2, 5.0.12, 6.0.3, and 6.0.4.

### Failing to Timely Inform
### Northampton County Radio ("NCR") That You Were On Duty

On March 14, 2012, you began your on call shift at 0700 hours. Nevertheless, you failed to notify NCR that you were available for assignments at that time. As a result, a police call from NCR that came into NB at 0740 hours was unnecessarily diverted to the Pennsylvania State Police. When the Chief interviewed you about this incident, you admitted to having failed to timely notify NCR of your on-duty status because you were engaged in a conversation with Police Officer Ledo. This conduct violated Sections 3.0.1, 3.0.2, and 6.0.2 of the Directive.

Please be advised that, as a result of your violations of the NB Outside Employment Policy, the above-described separate violations, and the cumulative impact of your violations of the specific sections of the Directive listed above, a hearing shall take place pursuant to Section 46191 of the Borough Code to determine what disciplinary action, if any, the Borough Council should take against you in your capacity as Police Officer of Nazareth Borough. The hearing is set for August 27, 2012, at 7:00 P.M. at the Council Chambers located at the corner of W. Center St. and Church St.

As always, you may have an association member, FOP representative, or attorney present at the hearing. Notification of whether you prefer a public hearing or closed hearing should be communicated to me no later than 4 pm on August 23, 2012.

Sincerely,

Fred C. Daugherty, Jr.
Mayor

Enclosures
Cc: Charles A. Ercole, Esq.

EXHIBIT "I"

## THE COUNCIL OF
## THE BOROUGH OF NAZARETH

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RE: Borough Council Executive Session, August 6, 2012
PO Lahovski Suspension

The Council of the Borough of Nazareth conducted a hearing by executive session on Monday, August 6, 2012 concerning the suspension with pay of Officer Frederick J. Lahovski, Jr. from July 18, 2012 to August 6, 2012 by Mayor Daugherty. Immediately following the hearing Borough Council reconvened in open session and passed a motion by unanimous vote approving the suspension with pay of Officer Lahovski from July 18, 2012 to August 6, 2012. Borough Council passed a second motion by unanimous vote continuing Officer Lahovski's suspension without pay to August 27, 2012. In support of said motions the Borough Council hereby makes the following findings of fact and conclusions of law:

1.  Officer Lahovski is employed as a full-time police officer by the Borough of Nazareth.

2.  Chief of Police Thomas Trachta testified to Borough Council regarding the results of his investigation into Officer Lahovski's handling of a domestic assault call on July 15, 2012.

3.  On July 15, 2012 Officer Lahovski was dispatched to the scene of a domestic assault call at the home of Jason and Maria Gruver, husband and wife, located at 454 Union Street, Nazareth, PA.

4.  Pennsylvania State Police had arrived at the scene approximately 30 minutes prior to Officer Lahovski as a result of Maria Gruver's 911 call in which she stated that she was assaulted by her husband Jason Gruver.

5.  Pennsylvania State Police (PSP) turned over control of the scene to Officer Lahovski upon his arrival.

6.  PSP informed Officer Lahovski that Maria Gruver was transported from the scene with injuries by EMS to St. Luke's Hospital.

7.  Officer Lahovski interviewed Jason Gruver at the scene.

8.  While on scene Jason Gruver told Officer Lahovski that he had an argument with his wife, Maria Gruver, that he had cut his own wrist, and that he was willing to go as a voluntary commitment to Lehigh Valley Hospital - Muhlenburg.

9.  Officer Lahovski failed to take Jason Gruver into custody and allowed Jason Gruver to be

transported to the hospital by EMS; Officer Lahovski only instructed Jason Gruver that upon his discharge from the hospital he should come to Nazareth Borough Police Headquarters for further investigation into the matter.

10.    Officer Lahovski failed to check if there were any outstanding warrants for Jason Gruver before releasing him to EMS.

11.    Jason Gruver did have an outstanding arrest warrant from March 7, 2009 for assaulting his wife.

12.    Officer Lahovski failed to properly investigate the Gruver residence for any other victims even though there was evidence in plain site indicating a child resided there.

13.    Officer Lahovski failed to properly investigate the Gruver residence and as a result, failed to discover evidence of a Jason Gruver's apparent blood-written apology on the upstairs bathroom wall.

14.    Officer Lahovski failed to properly investigate the Gruver residence and as a result, failed to discover evidence of a marijuana grow operation that was being conducted inside the residence.

15.    On July 15, 2012, after taking control of the scene and being briefed by PSP, Police Officer Lahovski only spent twenty-six minutes handling this domestic assault incident.

16.    On July 16, 2012, Jason Gruver was taken into custody by Chief Trachta and Nazareth Borough Police Officer Benjamin Rizzotto.

17.    On July 16, 2012, Jason Gruver was arraigned before Judge John Capobianco and charged with Attempted Murder, Aggravated Assault, Reckless Endangerment, Simple Assault-Domestic Violence and Harassment; he was remanded to Northampton County Prison on $100,000 straight bail.

18.    On July 18, 2012, after conducting an investigation into this incident, Chief Trachta recommended to Mayor Daugherty that Officer Lahovski be suspended.

19.    Chief Trachta stated that Officer Lahovski exhibited conduct unbecoming an officer and unsatisfactory performance of his duties in regards to this incident and recommended to Borough Council that Officer Lahovski's suspension be continued until further investigation is completed.

20.    Mayor Daugherty testified that upon being informed of Officer Lahovski's conduct in regards to this incident by Chief Trachta, the Mayor agreed with Chief Trachta's

2

recommendation that a suspension was warranted.

21.   On July 18, 2012, Officer Lahovski was suspended with pay by Mayor Daugherty until the next Borough Council meeting on August 6, 2012.

22.   Mayor Daugherty recommended to Borough Council that Officer Lahovski's suspension be continued until further investigation is completed.

23.   Officer Lahovski was present at the hearing and represented by counsel Richard Todd Eagen, Esquire.

24.   Officer Lahovski did not present any testimony at the hearing regarding his conduct in regards to the Gruver incident or his subsequent suspension.

25.   The Borough Council finds the testimony of Chief Trachta and Mayor Daugherty credible.

26.   The Borough Council finds Officer Lahovski exhibited conduct unbecoming an officer and unsatisfactory performance of his duties.

WHEREFORE, Council of the Borough of Nazareth approves Mayor Daugherty's action to suspend Officer Lahovski with pay from July 18, 2012 until August 6, 2012 and Council suspends Officer Lahovski without pay, effective August 6, 2012 until August 27, 2012.

Council of the Borough of Nazareth

Dated: AUC 17, 2012

By

Daniel Chiavaroli, President

3

EXHIBIT "J"

# THE COUNCIL OF
# THE BOROUGH OF NAZARETH

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RE:  Borough Council Executive Session, August 27, 2012
     PO Lahovski Suspension/Termination

On Monday, August 27, 2012, the Council of the Borough of Nazareth conducted a hearing in executive session concerning charges brought to the Borough Council, by Attorney Charles Ercole representing Mayor Fred Daugherty, alleging that on several occasions Borough of Nazareth Police Officer Frederick J. Lahovski, Jr. violated various Professional Standards as a police officer and the Borough of Nazareth's Outside Employment Policy. Based on this hearing the Borough Council hereby makes the following findings of fact and conclusions of law:

1.  Appearing on behalf of the Borough of Nazareth (the "Borough") were Charles Ercole, Esquire and Lee Moylan, Esquire.

2.  Officer Lahovski was in attendance and represented by Richardson Todd Eagen, Esquire.

3.  The Borough called Borough of Nazareth Police Chief Thomas Trachta as its first witness.

4.  By reviewing Officer Lahovski's related Incident Report, Chief Trachta testified that on July 15, 2012 Officer Lahovski was dispatched to the scene of a domestic assault call at the home of Jason and Maria Gruver.

5.  The separate incident reports of Officer Lahovski and Borough of Nazareth Police Officer Rizzotto, related to the Gruver domestic assault, were offered together as Borough Exhibit #1 and are attached hereto for reference.

6.  On July 18, 2012, following Chief Trachta's recommendation, Officer Lahovski was suspended by Mayor Daugherty for conduct unbecoming an officer and unsatisfactory performance of his duties in regards to his conduct concerning the Gruver domestic assault incident.

7.  On August 6, 2012, Borough Council held a hearing during which it heard testimony from Chief Trachta and Mayor Daugherty regarding Officer Lahovski's conduct concerning the Gruver domestic assault incident.

8.  On August 6, 2012, Borough Council approved Mayor Daugherty's suspension of

Officer Lahovski and continued the suspension until August 27, 2012.

9.  On August 17, 2012, Borough Council issued Findings of Fact and Conclusions of Law in regards to the August 6, 2012 hearing, said Findings of Fact and Conclusions of Law were offered as Borough Exhibit #2 and are attached hereto for reference.

10. Chief Trachta reviewed Borough Council's Findings of Fact and Conclusions of Law in regards to the August 6, 2012 hearing and found them to be accurate, with minor exceptions, and confirmed that the basic facts and conclusions expressed therein remained unchanged since the August 6, 2012 hearing.

11. Pennsylvania State Police (PSP) were the first to arrive at the scene of the Gruver domestic assault.

12. The Borough offered the Incident Report of PSP Trooper Christopher C. Smith, Jr. as Borough Exhibit #3. Said Incident Report is attached hereto for reference.

13. The Borough offered a packet of photographs of the Gruver domestic assault scene, taken by PSP, as Borough Exhibit #4. Said photo packet is attached hereto for reference.

14. After review of Borough Exhibits #1-4, Chief Trachta testified that Officer Lahovski exhibited conduct unbecoming an officer and unsatisfactory performance of his duties in regards to the Gruver domestic assault incident.

15. Chief Trachta testified that Officer Lahovski is employed as the Chief of Police in the Borough of Forty-Fort, Pennsylvania, located approximately 90 minutes drive-time from the Borough.

16. Chief Trachta testified that, when not under suspension, Officer Lahovski was a scheduled full-time Borough police officer (80 hrs/2 weeks).

17. Chief Trachta testified that since his employment as Chief of Police in Forty-Fort, Officer Lahovski has changed from a highly motivated police officer with good public relations skills to an officer who makes less arrests and is often combative with superiors and the public.

18. The Borough offered a Memo written by Chief Trachta addressed to Mayor Daugherty, dated July 5, 2012, as Borough Exhibit #5. Said Memo is attached

2

hereto for reference.

19. The subject of Chief Trachta's Memo is the Chief's investigation into a citizen complaint filed against Officer Lahovski by Larry Vandever, a Borough resident.

20. The Borough offered the Vandever citizen complaint letter, dated June 25, 2012, as Borough Exhibit #6. Said letter is attached hereto for reference.

20. Chief Trachta testified that Mr. Vandever approached Officer Lahovski on two separate occasions to discuss/notify the police of possible issues concerning the Borough.

21. Chief Trachta testified that Officer Lahovski refused to listen to any of Mr. Vandever's concerns and was rude and belittling to Mr. Vandever while referring him to Chief Trachta for any police assistance regarding his concerns.

22. Chief Trachta testified that Officer Lahovski's actions towards Mr. Vandever constituted conduct unbecoming an officer and were unacceptable.

23. Chief Trachta testified to the details regarding a verbal confrontation that occurred between himself and Officer Lahovski on April 4, 2012 which led to Borough Council issuing Officer Lahovski a 10 day suspension without pay for conduct unbecoming an officer.

24. Chief Trachta testified that one of the issues involved in the April 4, 2012 confrontation was Officer Lahovski's intention to transfer Borough property (signs) to Forty-Fort Borough without permission from Chief Trachta.

25. Chief Trachta testified that Officer Lahovski often forgets his rank is police officer and not chief of police and must be reminded of such by Chief Trachta.

26. Chief Trachta testified that, in summary, Officer Lahovski should be terminated.

27. Officer Lahovski declined the opportunity to question Chief Trachta.

28. The Borough called Borough of Nazareth Mayor Fred Daugherty as its second witness.

29. Mayor Daugherty testified that he sent a letter to Officer Lahovski notifying Officer Lahovski of the August 27, 2012 hearing and of the charges that would be

3

presented. A copy of said letter is attached hereto for reference.

30.    Mayor Daugherty testified that on February 6, 2012 Officer Lahovski used the
       Borough name to purchase equipment without authority, in violation of various
       police directives.

31.    The Borough offered a Memo written by Chief Trachta addressed to Mayor
       Daugherty, dated February 21, 2012, as Borough Exhibit #7. Said Memo is
       attached hereto for reference.

32.    The subject of Chief Trachta's Memo is the Chief's investigation into a possible
       citizen complaint regarding Officer Lahovski's conduct when he responded to a
       call on February 12, 2012 to Check the Welfare of a Child.

33.    The informing party reported she heard possible child abuse in her neighbor's
       apartment and upon Officer Lahovski's arrival she told him she wished to remain
       anonymous. In response, Officer Lahovski presented her with an ultimatum, if
       she did not provide her name and information he would not check on the child.

34.    The Borough offered as Borough Exhibit #8 a Memo written by Chief Trachta
       addressed to all personnel of the Nazareth Borough Police Department, dated
       March 21, 2012. Said Memo is attached hereto for reference.

35.    Chief Trachta's March 21, 2012 Memo reinforced to the police officers the
       policies and procedures that they were expected to follow as part of their duties as
       members of the police department.

36.    Mayor Daugherty testified that Officer Lahokski violated these procedural and
       policy rules on May 19, 2012 when he failed to write an incident report as
       required and only filed the report 14 days later upon direction from Chief Trachta.

37.    Mayor Daugherty testified that Officer Lahovski violated procedural and policy
       rules on March 14, 2012 when he failed to report in to the Northampton County
       Radio dispatch at the start of his shift as required.

38.    The Borough offered as Borough Exhibit #9 a news article from the
       TimesLeader.com website, dated March 21, 2012. Said article is attached hereto
       for reference.

39.    The subject of the news article is Forty Fort Borough and Officer Lahovski, who

4

was hired as its police chief in September 2011.

40. Mayor Daugherty testified that he is not aware of the Borough ever allowing an employee to hold a second job over 90 minutes outside of the Borough.

41. Mayor Daugherty testified that he is not aware of the Borough ever allowing a police officer to hold a second job as a police chief in another municipality.

42. Mayor Daugherty testified that since Officer Lahovski began working as chief of police in Forty Fort his conduct and attitude have changed, that there has been a decline in his attitude and efforts and, that there is ongoing conflict between Officer Lahovski and Chief Trachta such that the police department is unable to run properly.

43. Mayor Daugherty testified that Officer Lahovski's conduct in regards to the Gruver domestic assault incident was a neglect of his duties and constitutes grounds for termination.

44. Mayor Daugherty testified that Officer Lahovski's violation of the Borough's Outside Employment Policy constitutes grounds for termination.

45. Mayor Daugherty testified that the Gruver domestic assault incident, in addition to the various other charges presented concerning Officer Lahovski's conduct, are evidence that Officer Lahovski's employment in Forty Fort is adversely affecting his performance and constitutes grounds for termination.

46. Officer Lahovski's only question to Mayor Daugherty was to inquire as to the effective date of the Borough's written Outside Employment Policy.

47. Mayor Daugherty testified that he did not know the effective date of the Outside Employment Policy.

48. The Borough called Borough of Nazareth Secretary/Treasurer Paul Kokolus as its third witness.

49. Mr. Kokolus testified that Officer Lahovski, for payroll tax purposes, wrote a letter addressed to the Borough Administrative Assistant by which he declared that Forty Fort Borough was his primary employer.

50. The Borough offered Officer Lahovski's letter, dated February 4, 2012, as

5

Borough Exhibit #10. Said letter is attached hereto for reference.

51.  Mr. Kokolus testified that he has been employed as the Secretary/Treasurer since 1997.

52.  Mr. Kokolus testified that he is not aware of any full time Borough police officer holding a second job as a police chief or a second job 90 minutes drive-time from the Borough.

53.  Officer Lahovski declined the opportunity to question Mr. Kokolus.

54.  Officer Lahovski did not offer any witnesses or testimony on his own behalf.

55.  The Borough Council finds the testimony of Chief Trachta, Mayor Daugherty and Mr. Kokolus credible.

56.  The Borough Council finds Officer Lahovski has exhibited conduct unbecoming an officer and unsatisfactory performance of his duties.

57.  The Borough Council finds that Officer Lahovski is in violation of the Borough's Outside Employment Policy.

58.  The Borough Council finds that the Gruver domestic assault incident, in addition to the various other charges presented concerning Officer Lahovski's conduct, are sufficient evidence that Officer Lahovski's employment in Forty Fort is adversely affecting his performance as a police officer for the Borough and creates an unsafe condition for the residents of the Borough.

WHEREFORE, by unanimous vote of the Council of the Borough of Nazareth on September 4, 2012, the Council exercises its authority under 1121(a)(2) of the Borough Code, to remove Officer Frederick J. Lahovski, Jr. from the Nazareth Borough Police Department.

Council of the Borough of Nazareth

Dated: SEPT 5, 2012                     By _____

Daniel Chiavaroli, President

6

EXHIBIT "K"

## AMERICAN ARBITRATION ASSOCIATION

*In the Matter of Arbitration Between:*

NAZARETH BOROUGH POLICE
ASSOCIATION

AAA Case #14-20-1300-0131 AVH
(Gr: Lahovski Discharge)

and

Walt De Treux, Esq., Arbitrator

BOROUGH OF NAZARETH

*Hearing Dates: 10/22, 11/19/13;
1/2, 1/13, 3/27, 4/8/14
Briefs Received: 5/29/14
Decision Date: 6/30/14*

Appearances: For the Association – Richardson Todd Eagen, Esq.,
LIGHTMAN WELBY
For the Borough – Lee Moylan, Esq.; Charles A. Ercole, Esq.,
KLEHR HARRISON

### Introduction and Statement of Relevant Facts

Grievant Frederick Lahovski began employment with the Nazareth Borough
Police Department (NBPD) as a part-time patrol officer in February 2008. He
achieved full-time status in July 2008. In January 2009, Lahovski was assigned to
the Detective position. While employed full-time with NBPD, he served as a part-
time police officer with other nearby municipalities.

In September 2011, Lahovski accepted employment as part-time
Administrative Police Chief with Forty Fort Borough, a municipality located
approximately 90 minutes away from the Borough of Nazareth. According to NBPD
Chief Thomas Trachta, Lahovski indicated that he would resign from the NBPD
around January 2012 after "clearing out his caseload." The Grievant did not resign.

Chief Trachta opined that Lahovski, previously viewed as a valuable member of the Department, was in a "downward spiral" before accepting the Forty Fort job and "got worse" after accepting the job. The Borough imposed a series of disciplinary actions against Lahovski beginning in early 2012[1], including a counseling for use of the Borough address to receive a personal order of fingerprinting supplies; a March 15, 2012 order from then-Mayor Fred Daugherty demoting him from Detective for various alleged performance issues; a March 2012 counseling session for not being in uniform; and a 10-day suspension in April 2012 for engaging in a heated argument with the Chief in the NBPD parking lot. The disciplinary actions were overturned through the grievance and arbitration procedure. A challenge to the demotion through an unfair labor practice charge alleging anti-union animus was denied.

On May 29, 2012, Mayor Daugherty sent Lahovski a letter advising that his "full-time position" as Forty Fort Chief of Police violated the Borough's outside employment policy. He directed Lahovski to inform him whether he "wished to resign the position in Forty Fort to continue [his] employment with Nazareth." Lahovski did not respond.

On June 15, 2012, the Mayor sent a follow-up letter that charged Lahovski with violating "a number of different sections" of Nazareth Borough's General

---

[1] Lahovski had received a 1-day suspension for an incident in January 2011 in which he had a disagreement with Chief Trachta and reacted by throwing a case file against the wall. Lahovski admitted his wrongdoing and accepted the forfeiture of one vacation day as penalty for his conduct. He grieved when the Borough changed the penalty to a 1-day suspension. On August 24, 2012, Arbitrator James Darby sustained the grievance and revoked the suspension, but he let the forfeiture of the vacation day stand.

3

Orders regarding Professional Standards. The charges included the parking lot argument with the Chief, the receipt of a personal order using the Borough's address, the failure to timely file an incident report regarding a child custody case, and the failure to notify Northampton County Radio that he was on duty.

On June 25, 2012, Nazareth Borough resident Larry Vandever came to the NBPD police station to complain that he was "blown off" twice by Lahovski when he attempted to discuss problems in his neighborhood. Vandever asserted that Lahovski directed him to see the Chief with his concerns. At the station, Lahovski was reportedly "rude and unprofessional" in dealing with Vandever, who filed a Citizen Complaint. Chief Trachta met with Vandever the next day.

On July 5, 2012, Chief Trachta authored a memo to Mayor Daugherty, advising him that he had opened an investigation of Lahovski in regard to the Vandever incident, alleging that the conduct, if true, constituted conduct unbecoming a police officer.

On the morning of July 15, 2012, Lahovski was dispatched to the home of Maria and Jason Gruver. Mrs. Gruver had called 911 to report that her husband assaulted her. The Pennsylvania State Police, who cover the Borough during the overnight hours, had responded initially. When Lahovski arrived, Mrs. Gruver had already been taken to the hospital. Mr. Gruver was being treated by EMS for self-inflicted cuts to his wrist. Lahovski assumed primary responsibility for the call and briefly questioned Mr. Gruver. A second EMS crew took Mr. Gruver to the hospital for possible stitches and a mental health evaluation. Lahovski advised Mr. Gruver to report to the NBPD after his release for a further interview. In his incident report,

4

Lahovski labeled the incident as "mental health" and identified Maria Gruver as the "suspect." He listed the case status as "Further Investigation." Lahovski conducted no further investigation that day.

In the late evening hours, NBPD was again dispatched to the Gruver resident. Mrs. Gruver's sister had gained entry to the house after she was unable to contact her sister. She found blood on the floor, up the stairs, and in an upstairs bathroom. Responding NBPD Officer Benjamin Rizzotto and other officers cleared the residence, confirming the presence of blood, a knife on the bedroom dresser, and a marijuana grow operation in the bedroom closet. Through County dispatch, he learned that Lahovski had handled a domestic call at the house earlier in the day. He contacted Lahovski to learn the details of the call; he listened to Mrs. Gruver's 911 call in which she stated that her husband had strangled her; and he contacted Chief Trachta and the District Attorney's office. Based on the investigation, Mr. Gruver was arrested the next day at the hospital and charged with Attempted Murder, Aggravated Assault and other related charges. He was subsequently sentenced to 10-20 years in prison.

On July 18, 2012, Chief Trachta informed the Mayor of an investigation into Lahovski's handling of the Gruver call. Chief Trachta asserted that Lahovski was deficient in failing to ascertain the facts of the Gruvers' dispute, failed to run Mr. Gruver for warrants before releasing him to EMS, failed to search the house for other victims or children, failed to locate the marijuana grow operation, and failed to find an apology written in blood by Mr. Gruver on the upstairs bathroom wall. Chief Trachta requested that Lahovski be suspended with pay pending further

investigation for failing to conduct a proper investigation. The Mayor suspended Lahovski.

On August 6, 2012, the Borough Council held a hearing, after which it approved the suspension of Lahovski and converted it a suspension without pay through August 27, 2012. On August 27, 2012, the Council held a hearing on numerous charges against Lahovski, including violations related to the Gruver incident, his outside employment as Chief of Forty Fort Borough, the Vandever complaint, his 10-day suspension for arguing with the Chief, his ordering of personal supplies using the Borough address, a February 21, 2012 incident in which he responded to a Check the Welfare of a Child call, his failure to timely prepare an incident report, and his failure to report on duty to County dispatch. The Council found that these actions constituted conduct unbecoming an officer and unsatisfactory performance of duties. It further found that Lahovski's employment with Forty Fort Borough violated Nazareth Borough's Outside Employment Policy.

On September 4, 2012, the Borough terminated Lahovski. The Union timely grieved the discharge. The parties were unable to resolve the grievance through the contractual steps, and the matter was referred to arbitration. On October 22 and November 19, 2013 and on January 2, 13, March 27, and April 8, 2014, hearings were held at Borough offices in Nazareth, Pennsylvania, during which time both parties had a full and fair opportunity to present documentary and other evidence, examine and cross-examine witnesses, and offer argument in support of their respective positions. Both parties filed post-hearing briefs, and the matter was submitted to the Arbitrator for a decision.

## Issue

The parties stipulated to the following issue,

*Was Grievant Frederick Lahovski terminated for just cause? If not, what shall be the remedy?*

## Analysis and Decision

The collective bargaining agreement between the Police Association and the Borough does not specifically include any just cause provision. However, through their stipulation to the issue in the present case, the parties recognize that just cause is the required standard for discipline, including discharge.

The Council found Lahovski's conduct unbecoming and his performance unsatisfactory for eight alleged incidents. However, two of those incidents – his argument with Chief Trachta in the parking lot and his ordering of personal supplies using a Borough address – had already resulted in discipline, a 10-day suspension and a counseling, respectively. Those disciplinary penalties were reversed by other arbitrators; and therefore, the incidents cannot be used to support Lahovski's termination or be considered part of a disciplinary progression. Further, the Borough did not present any evidence regarding Lahovski's alleged failure to report to County dispatch that he was on duty. Accordingly, that incident cannot be cited as a reason for his discharge.

The Borough is left with five incidents for which it determined Lahovski should be terminated – the failure to file a timely report in a child custody case; the Vandever complaint; Lahovski's respond to the Check the Welfare of a Child call; the

Gruver incident; and the alleged violation of the Borough's Outside Employment Policy. Each incident will be evaluated separately, but no evaluation would be complete without a consideration of the atmosphere within the Department in 2011 and 2012 and the context of the disciplinary actions taken against Lahovski.

In the August 27, 2012 hearing before Council on Lahovski's termination, Chief Trachta described the Grievant as "a highly motivated police officer with good public relations skills" who, after acceptance of the Police Chief position in Forty Fort, became "an officer who makes less arrests and is often combative with superiors and the public." At the same hearing, former Mayor Daugherty[2] testified that Lahovski's "conduct and attitude have changed, that there has been a decline in his attitude and efforts and, that there is ongoing conflict between Officer Lahovski and Chief Trachta such that the police department is unable to run properly."

The Borough's view of Lahovski's performance is reflected in his disciplinary history. Prior to becoming part-time Chief in Forty Fort, Lahovski had been cited once for throwing a case file against a wall during a disagreement with the Chief over the contents of a police report. Lahovski accepted responsibility and was required to forfeit a vacation day.[3] After Lahovski's employment with Forty Fort began, the Borough issued multiple disciplinary actions ranging from the previously mentioned counseling to the 10-day suspension. The disciplinary actions, not

---

[2] Daugherty did not testify at the arbitration hearing.

[3] When the Borough recorded the penalty as a one-day suspension, Lahovski grieved. Arbitrator James Darby sustained the grievance as to the one-day suspension, but let stand the vacation day forfeiture. (The Darby Award issued August 24, 2012, less than two weeks before Lahovski's termination.)

8

including the incidents to be evaluated in the present case, were not sustained through the grievance and arbitration procedure. Accordingly, at the time of termination, Lahovski had a clean disciplinary record except for the one-day vacation forfeiture in January 2011.

The Union's unfair labor practice charge protesting Lahovski's demotion from Detective was unsuccessful, based in part on Mayor Daugherty's testimony that the Department's staffing situation required all officers on the street performing their own investigation. However, the Mayor's March 15, 2012 letter to Chief Trachta ordering the demotion did not cite any staffing concerns. Rather, it referred to the incident in which Lahovski allegedly failed to notify County dispatch that he was on duty; an incident in which he was allegedly out of uniform (later dismissed by Council during the grievance procedure); and the ongoing investigation of the Check the Welfare of a Child call.

The Mayor's interest in Lahovski has been well documented. When a local newspaper ran an article in September 2011 regarding Lahovski's appointment as Police Chief of Forty Fort Borough, Mayor Daugherty emailed Chief Trachta asking if the article "constitute[s] a resignation letter." Further, Chief Trachta, who admittedly did not share a good relationship with the Mayor, testified in the 10-day suspension arbitration that the Mayor asked him to investigate Lahovski more than any other officer in the Department. The Chief also testified that the Mayor would not administer a sergeant's examination because the Borough did not want Lahovski to obtain that position. In the Chief's opinion, the Borough wanted Lahovski to resign; and the Chief, who believed he was "placed in a difficult position, doing his

best to 'keep the peace'," suggested to Lahovski several times that he should resign. In that case, Arbitrator Jared Kasher found that "Mayor Daugherty certainly was targeting the Grievant and treating him in a disparate manner, stating that he 'didn't think he was fit to be on the Police Department' and that he 'would have terminated him long before'."

At the arbitration in the present case, Chief Trachta described the atmosphere in the Department as "unstable" and "not very nice for anyone." Part-time Patrol Officer Daniel Troxell echoed that opinion, stating that the Department was "going downhill" in 2011 and 2012. He reported that the rumors in the Department were that "Council wanted [Lahovski] out."

While Troxell's report of rumors is not reliable testimony to ascertain Council's intention, it is indicative of the atmosphere surrounding the repeated disciplinary actions taken against Lahovski. Lahovski, admittedly intent on securing a Police Chief position, talked about it often to Chief Trachta and others. Apparently fueled by Lahovski's acceptance of a position in Forty Fort, the Mayor became keenly interested in seeing Lahovski's employment with the Borough end. And Chief Trachta had the unenviable task of managing a police force, an outwardly ambitious and opinionated officer, and a demanding Mayor.

While Chief Trachta and the Mayor opined that Lahovski's performance declined, the incidents they cited to support that opinion did not hold up under the scrutiny of the grievance and arbitration procedure. Disciplinary actions that are found to have no justifiable basis cannot adequately document a decline in

performance. Rather, they suggest that the Mayor was unsuccessfully trying to build a case for removing Lahovski from the Department.

It was in this atmosphere that Council leveled the charges giving rise to Lahovski's termination. Without any significant disciplinary history after the revocation of previously imposed disciplinary actions, the charges have to stand on their own merit. Accordingly, the issue is whether Lahovski engaged in the conduct alleged and if so, did his conduct for any or all of the incidents warrant termination.

## Late Filing of the Incident Report

On March 21, 2012, Chief Trachta issued a memo to all members of the NBPD. In that memo, he reminded officers that they had to submit incident reports "before the expiration of their tour or as soon as practical, (which is usually the following day)." He also reminded them to log their incidents into the Incident Log before the expiration of their tour,

On May 19, 2012, Lahovski handled an incident involving child custody. The complainant Karnett Benner sought a copy of the report for a court hearing, and Chief Trachta discovered that Lahovski had not completed an incident report or entered the incident in the logbook. At the Chief's direction, Lahovski completed the report on June 1, 2012, almost two weeks after the incident. Lahovski testified that he simply forgot to write the report.

Admittedly, Lahovski did not file the incident report within the required time, and his failure to do so supports an allegation of unsatisfactory performance.

Although the Borough seeks to discipline Lahovski for this infraction, the Association offered evidence that other officers, including Officers Troxell and Rizzotto, have failed to timely file reports in the past and have not been disciplined. Rather, they have been reminded by the Chief to comply with the time requirements. As there is no other evidence that Lahovski has failed to timely file reports in the past, it would be expected that, at most, he would have been counseled for his failure in this case.

## Vandever Complaint

Nazareth Borough resident Larry Vandever came to the NBPD on June 25, 2012 to complain about Lahovski, who reportedly dismissed Vandever on two occasions when the resident tried to express neighborhood concerns. Lahovski allegedly referred him to the Chief, telling Vandever that he was only doing what he has to do and did not feel it was his job to listen to the resident. Vandever testified that Lahovski was rude and unprofessional, an observation seconded by Officer Troxell who stated that Lahovski seemed be "having a bad day" when he met Vandever at the station. Troxell testified that he calmed Vandever, but nonetheless, Vandever filed a Citizen Complaint. In conducting his investigation, Chief Trachta expressed concern with Lahovski passing off routine patrol duties to the Chief.

Lahovski and the Association described Vandever as an overzealous citizen who repeatedly made complaints to the police and, more damning, has allegedly asked police to run vehicle license plates for him and had plead guilty in the past to impersonating a state constable. While Chief Trachta acknowledged that Vandever

could be "a pain in the ass," he emphasized that NBPD officers were obligated to listen and be respectful to any citizens who come to them with concerns.

The unflattering portrait of Vandever painted by Lahovski and the Association does not relieve Lahovski from his obligation to be "courteous and tactful," as described in the Borough's Professional Standards Directives (most of which were written by Lahovski). Significantly, Lahovski does not deny the allegations made by Vandever.

Based on the Borough's evidence and Lahovski's lack of a denial, I find that Lahovski did engage in improper conduct when he acted dismissive, rudely and unprofessional toward Vandever. The penalty warranted for such conduct standing alone is somewhat more difficult to determine since Borough Council did not specify any sections of the Borough's Professional Standards that were violated[4]. Rather, Council generally concluded that his actions in all relevant incidents constituted conduct unbecoming and unsatisfactory performance. Accordingly, the appropriate penalty will have to be considered in combination with all other proven allegations.

## Check the Welfare of the Child Call

On February 12, 2012, Josalynn Rowlands called 911 to report that she heard a child in a nearby apartment crying and yelling, "Please don't hit me," something she had also heard during the previous week. Then-Detective Lahovski responded

---

[4] When Chief Trachta notified the Mayor of his investigations into Lahovski's conduct in this and other incidents, he specified which sections of the Professional Standards may have been violated, if the allegations proved true. The Mayor's *Loudermill* letters and Council's Findings of Fact and Conclusions of Law did not cite to the Professional Standards, but rather, generally referenced unsatisfactory performance and conduct unbecoming.

to the call. Rowlands met him, and he asked her for identifying information. She expressed her desire to remain anonymous, and Lahovski told her, "Anonymous reports get anonymous results." She reluctantly gave him the requested information.

When he arrived at the apartment, a male answered the door, and Lahovski entered the foyer where he observed a female and a young female child. Lahovski explained his purpose for being there, and the male explained that the child was having a temper tantrum over breakfast. He did not observe any bruises on the child, nor did he find anything else that caused him to be concerned about the safety of the child. He apologized for the intrusion and left the scene. The entire call lasted six minutes.

Not long after the incident, Lahovski received a call from Kimberly Guerin, Rowlands' mother, who was "irate" that Lahovski had required her daughter to give identifying information. Guerin later claimed that Lahovski hung up on her. She followed up by filing a Citizen Complaint, and a few days later, discussed the incident with Chief Trachta by phone. That same day, the Chief contact Rowlands who expressed her dissatisfaction with Lahovski, particularly his insistence on her identification and her perception that he was annoyed that he was responding to the call.

Chief Trachta personally investigated the complaint, including visiting the scene and interviewing the child's mother and the child. On February 21, 2012, he notified the Mayor of his investigation, stating "more facts need to be ascertained." He warned that it may be "a very serious matter" for three reasons: Lahovski

14

compelled Rowlands to give identifying information and was generally passive in the investigation of her complaint; he hung up on Guerin; and he possibly impersonated the Chief or had some else impersonate the Chief in return phone calls to Guerin. The Chief advised the Mayor that he was delaying a "Weingarten hearing" until he could be sure there would be no criminal investigation. He eventually interviewed Lahovski on April 3, 2012.

At hearing, Chief Trachta explained that Lahovski's performance was unsatisfactory and constituted unbecoming conduct because he improperly advised Rowlands that she had to give identifying information, did not establish the relationship of the adult female in the apartment to the child, did not check the apartment for other children, did not report the incident to Children and Youth Services, did not follow up with Rowlands after visiting the apartment, and dismissed Guerin's call.[5]

However, the Borough took no immediate action to discipline Lahovski for this incident. The Mayor wrote a *Loudermill* letter to Lahovski on June 25, 2012 citing various violations. His letter did NOT include the Check the Welfare of a Child incident. The incident resurfaced after the Gruver incident and was included in a August 2012 letter from the Mayor listing the charges on which Council later based its termination decision. The delay in disciplining Lahovski for this incident diminishes the Chief's expressions of concern with the seriousness of the matter. It

---

[5] Guerin did not testify so there is no reliable evidence that Lahovski hung up on her. Chief Trachta admitted there was no verifiable evidence that Lahovski or someone instructed by Lahovski called Guerin impersonating the Chief.

demonstrates that the Mayor and Council did not take those concerns as seriously as the Chief.

To be fair, Chief Trachta's initial concerns, as expressed in his February 21, 2012 memo to the Mayor, focused on Lahovski's initial contact with Rowlands at the scene and his subsequent contact with Guerin and possible impersonation of the Chief. It was less focused on the actual investigation of the complaint.

Lahovski all but admitted that he required Rowlands to identify herself. He does not recall saying, "Anonymous reports get anonymous results;" but he did tell the Chief in his interview, "...I spoke with her that anonymous citizens or anonymous complaints limit how intrusive the police can be...I did encourage her to be a known complainant and she did consent to that." Based on his own admission, I find that Lahovski improperly and unnecessarily required Rowlands to give identifying information.

I am not persuaded that Lahovski failed to properly handle the investigation of the complaint. I note first that Council did not charge Lahovski with failing to properly investigate. Although it was a focus of the Chief's testimony at the arbitration hearing, the Council's Findings of Fact and Conclusions of Law resulting in Lahovski's termination only references Lahovski's "ultimatum" to Rowlands that "if she did not provide her name and information he would not check on the child." It did not cite any failure in the actual check of the apartment and the child. Although Chief Trachta may have had concerns with Lahovski's failure to talk to the mother, failure to check the apartment for another child, and failure to notify Children and Youth Services, his reasons for seeking discipline do not trump

Borough Council's reasons for imposing discipline. Council did not discipline Lahovski for his conduct during the investigation of the apartment.

Further, Lahovski credibly testified that he did not observe anything at the scene that alarmed him or alerted him to any abuse. Chief Trachta's subsequent investigation did not uncover anything untoward in the couple's treatment of the child. Although Lahovski may have taken some additional steps to allay any concerns, the Borough has not presented sufficient evidence that his investigation was so inadequate or lacking that his findings were not reliable.

An appropriate penalty for Lahovski's infraction in requiring Rowlands to provide her information will be discussed in the context of all proven allegations.

#### Gruver incident

Soon before 6 a.m. on July 15, 2012, Maria Gruver called 911 to report that she needed an ambulance. She said her husband had assaulted her; she claimed she was dying; and she explained that she could not move from the neck down. The Pennsylvania State Police (PSP) provide coverage for Nazareth Borough in the overnight hours. As no NBPD officer was yet on duty, PSP Troopers Smith and Russo were dispatched to the scene. According to Trooper Smith's "Assignment Report" and the "Call Number Detail" (referred to as the "rip and run"), they found Maria Gruver "lying on the living room floor on her back with a blanket across her body." The Troopers reported a domestic incident and requested an EMS. They found Jason Gruver in a second floor bathroom. He admitted there was a confrontation between him and his wife. He had three scratches on his chest; he had

cut his wrist with a knife; and he had written in blood on the bathroom shower wall ("I (heart) you so much sorry"). The Troopers called for a second EMS, and Trooper Russo took pictures of the scene in the bathroom. After Mrs. Gruver was transported to the hospital by ambulance, Grievant Lahovski arrived, having recently come on duty.

Trooper Smith, who did not testify at the arbitration hearing, briefed Lahovski as Trooper Russo was upstairs. According to Lahovski, Trooper Smith informed him that Maria Gruver alleged an assault, but had no visible marks on her. He explained that Jason Gruver had scratches on his chest and had cut his own wrist. When Trooper Russo came downstairs, he explained that Mrs. Gruver had been taken to the hospital. Lahovski informed the Troopers that he would take over the investigation, and Trooper Russo indicated that he would email the pictures of the bathroom scene to Lahovski.

At the time of Lahovski's arrival, Jason Gruver was in the living room being treated by EMS. Lahovski interviewed Mr. Gruver, who explained that he and his wife had been out celebrating a birthday, and they came home and engaged in a verbal argument. Mr. Gruver claimed that he restrained his wife after she attacked him. She said she was hurt and called an ambulance. He became despondent and cut his wrist. Lahovski informed Mr. Gruver that he needed to go to the hospital for possible stitches and a mental health evaluation. He instructed Mr. Gruver to report to the police station for an interview when he was released from the hospital. Mr. Gruver agreed, and EMS transported him to the hospital.

Lahovski testified that he expected that he would be charging Maria Gruver with assault. He listed her as the "suspect" on his incident report. He classified the matter as "mental health," purportedly because he was unsure if it was a domestic dispute. He listed the case status as "further investigation." Admittedly, he conducted no further investigation that day, claiming he had to wait for Jason Gruver to return for an interview.

The case obviously turned out far different than Lahovski anticipated. After Officer Rizzotto visited the scene that night, he contacted the hospital and learned that Maria Gruver had suffered a fractured vertebra and had emergency surgery. He also listened to the 911 call where Mrs. Gruver had stated, "my husband strangled me." Based on that information, the NBPD obtained an arrest warrant for Jason Gruver on charges of Attempted Murder, Aggravated Assault, and related charges. Jason Gruver was subsequently convicted and sentenced to 10-20 years in prison.

In his review and investigation of the incident, Chief Trachta noted that Lahovski should have,

- Talked to both Maria and Jason Gruver;
- Determined if there were any children in the house;
- Checked every room of the house (which would have led him to discover the marijuana grow operation in the bedroom closet and the apology written in blood);
- Classified the matter as a domestic incident;
- Listened to the 911 tape;
- Notified the Chief per Department policy; and

• joined in the transport of Jason Gruver to the hospital or notified the hospital not to release him in anticipation of arresting him.

Chief Trachta asked the Mayor to suspend Lahovski pending investigation, and the Mayor quickly agreed. The Chief raised legitimate concerns with the investigation, but a proper review of Lahovski's conduct depends on the situation as Lahovski encountered it that morning. Inexplicably, the Chief did not question Lahovski about the situation before recommending his suspension.

Troopers Russo and Smith were first on the scene. Maria Gruver was already transported to the hospital by the time Lahovski arrived. Although Trooper Smith told Lahovski that Maria claimed an assault, Trooper Russo informed him that Jason Gruver made the same claim. Trooper Smith did not testify, so there is no evidence as to exactly what he told Lahovski, other than Lahovski's recollection of their conversation. There is no evidence that the Troopers suggested that Jason Gruver be arrested for his actions. And the Troopers stayed on scene after Lahovski took over the investigation because their vehicle had a flat tire. They were present when Jason Gruver was placed into the ambulance. Lahovski spoke with them after the ambulance left. The Troopers raised no alarms that Lahovski did not accompany Mr. Gruver to the hospital or place him under arrest.

Further, the Troopers were at the scene for approximately 37 minutes before Lahovski arrived. Trooper Russo was upstairs taking pictures of the bathroom scene, including the apology written in blood. The Troopers did not observe any

marijuana grow operation[6], nor did they have any concerns with any children in the house. Chief Trachta faults Lahovski for failing to take certain actions that the Troopers did not take. And the Troopers did not give any indication that they shared the concerns that later became apparent in the case.

Lahovski's actual failings in this case came from his lack of investigation after he left the scene. As Chief Trachta notes, he should have listened to the 911 call; he should have called the hospital to check on Maria Gruver's condition and possibly speak with her; he should have listed the matter on the incident report as a domestic case, which would have compelled a more thorough investigation; he should have checked Jason Gruver for warrants[7]; and he should have alerted the Chief to the seriousness of the incident. Lahovski's claim that there was nothing for him to do until he could interview Jason Gruver is contradicted by Chief Trachta's recitation of the investigatory actions he could have taken to better ascertain the facts. These later investigatory steps would have alerted Lahovski to the true nature of the case.

For these reasons, I find that the Borough has not produced sufficient evidence to prove that Lahovski's conduct at the scene constituted unsatisfactory performance, but it has demonstrated that he failed to properly and adequately conduct further investigation of the matter.

---

[6] NBPD Officer Nick Timar testified that there was evidence of marijuana throughout the house, an observation that is not reliable as it was not corroborated by any of the other persons present in the house, including the PSP Troopers, EMS Tracy Miller, Officer Rizzotto, or Lahovski.

[7] There was an outstanding warrant for Mr. Gruver, although it did not come up when Officer Rizzotto ran a check. Nonetheless, Lahovski should have conducted such a check.

## Outside Employment

In March 2012, Borough Council passed an Outside Employment Policy, apparently due to Lahovski's acceptance of the Forty Fort position. The policy requires approval for any outside employment and warns that such employment must not "adversely affect job performance and ability to fulfill all responsibilities to the Borough of Nazareth." Council cited the policy as one of its reason for terminating Lahovski. It noted the Mayor's testimony before Council that the Gruver incident "in addition to various other charges...are evidence that Officer Lahovski's employment in Forty Fort is adversely affecting his performance and constitutes grounds for termination."

The Union argues that Lahovski was never made aware of the policy, which was adopted months after Lahovski became part-time Chief in Forty Fort. Although notice of the policy is an important element of just cause, Lahovski's knowledge of the policy is not material to the present case because the Borough offered no evidence to support the Mayor's speculation that it was the Forty Fort job that allegedly adversely affected Lahovski's performance.

There is no evidence in the record of the actual hours Lahovski worked at Forty Fort and how those hours compared and intersected with his scheduled hours at NBPD. Lahovski testified that he worked part-time (from 8-30 hours per week) at various municipalities throughout his NBPD career and during times Chief Trachta described him as "a highly motivated officer." The Borough offered no evidence to demonstrate that the Forty Fort position occupied more of his time than other part-

time jobs or that his duties somehow interfered with his responsibilities at the NBPD.

Even if one were to accept that Lahovski's performance as a Nazareth Borough officer had become unsatisfactory, there is no reliable evidence to attribute that decline in performance to his role in Forty Fort. Chief Trachta's observation that Lahovski's performance declined after accepting the part-time Chief position is diminished by the Mayor's apparent campaign to remove Lahovski from the force through several meritless disciplinary actions that did not withstand scrutiny through the grievance and arbitration procedure.

For these reasons, I find that the Borough has not proven that Lahovski violated the Outside Employment policy.

## An Appropriate Penalty

Borough Council charged Lahovski with conduct unbecoming and unsatisfactory performance based on eight separate incidents. It had already imposed discipline (later overturned) for two of the incidents – the ordering of personal supplies and the parking lot argument with the Chief, and it cannot now use those same incidents to justify disciplinary action in the present case. The Borough offered no evidence on a third incident regarding Lahovski's alleged failure to notify County dispatch that he was on duty. The Borough failed to prove its charge that Lahovski violated the Outside Employment Policy.

There were varying degrees of merit to the four remaining charges – the late incident report, the Vandever complaint, the Check the Welfare of the Child call, and

the Gruver incident. But the elimination of four of the eight charges on which Council based its termination decision raises a serious question as to whether termination is an appropriate penalty. Would Council still have terminated Lahovski absent those four unproven charges? And the four charges with merit present some considerations as to penalty, as explained below.

For other officers, a late incident report has not resulted in any disciplinary action above a counseling. This minor violation would surely not result in Lahovski's termination nor would it significantly increase, if at all, the penalty for the other proven infractions.

The Vandever complaint does not, in and of itself, warrant significant discipline. Although Chief Trachta took decisive steps to investigate the incident, the Borough tellingly did not inform Lahovski that he faced any disciplinary action for his conduct until it issued the Mayor's *Loudermill* letter on all the charges for termination in late August 2012. The Borough's failure to act on the incident closer to its occurrence in late June 2012 suggests that it was added to the charges to bolster a case for termination rather than correct any deficiency in Lahovski's conduct.

Lahovski was rude and unprofessional to a citizen. Although the Chief acknowledged that the resident was a "pain in the ass," he also recognized that Vandever deserved the same service accorded to any citizen. Lahovski's attitude toward Vandever could have been quickly addressed through counseling or a more formal reprimand. It would not warrant termination standing alone, nor would it significantly increase the penalty for the other infractions.

Similarly, the Borough's long delay in addressing Lahovski's conduct in the Check the Welfare of a Child call suggests it resurrected this incident to bolster its decision to terminate. But it took minimal action at the time. Chief Trachta was legitimately concerned that Lahovski hung up on Guerin and may have impersonated the Chief or had another officer impersonate the Chief to dissuade or intimidate Guerin from pursuing a complaint. But those concerns did not pan out. The Chief notified the Mayor of his other concerns with Lahovski requiring Rowlands to give identifying information and not properly investigating the potential child abuse. But the Mayor did not pursue discipline; he did not raise the matter in his June 25, 2012 *Loudermill* notice to Lahovski on other alleged incidents. It was not until the mid to late-August *Loudermill* notice that he added in the Rowlands' complaint.

The Borough's long-delayed pursuit of this charge mitigates, if not, negates just cause for any disciplinary action. But even if one were to consider the charge, Council ignored Chief Trachta's broader concerns of an improper investigation and focused solely on Lahovski's pressure on Rowlands to provide identifying information. Based solely on that conduct, the disciplinary action would, at best, rise to the level of a written warning or short (1-2 day) suspension.

The Borough's delay in administering discipline for the Vandever and Rowlands/Guerin complaints runs counter to the purpose of progressive discipline. Had Lahovski been timely counseled and disciplined for his conduct in these incidents, perhaps he would have corrected his deficiencies and improved his performance. If not, the Borough could justifiably argue that more serious discipline

is warranted after the Gruver incident because Lahovski failed to improve after less harsh discipline. But in combining all these charges in one proceeding, the Borough sidestepped the progressive disciplinary process. Such action does not comport with just cause.

Lahovski's performance in the Gruver incident was unsatisfactory. Although the Borough has not shown that his actions at the scene warrant discipline, his failure to properly investigate after leaving the scene does justify disciplinary action. However, termination is not an appropriate penalty. As noted by the Borough, Lahovski was a highly motivated officer who was assigned considerable responsibility in the Department. He had no significant disciplinary record. He was the subject of a campaign by the former Mayor to remove him from the force to the extent that another arbitrator labeled it as "targeting" and "disparate treatment." He was improperly disciplined on multiple occasions, as the disciplinary actions did not survive the grievance and arbitration process. There was no basis for four of the eight charges used to support his termination, and three of the remaining four charges, if administered in a timely manner, would have warranted relatively minor penalties ranging from counseling to no greater than a one or two day suspension.

The Gruver incident called for a significant penalty that conveyed to the Grievant that he has to remain professional in his job and responsibilities regardless of the atmosphere of the NBPD, the rash actions of his superior (the Mayor), and his own ambitions to achieve a position higher in rank. Termination is not an appropriate penalty because it fails to take into account the lack of merit in four of the eight charges on which termination was based and the delayed discipline in

three of the four remaining charges. Further, termination ignores the lack of any prior significant discipline, the lack of any progressive discipline, the length of good service of the Grievant, and the "unstable" atmosphere in which the Grievant and his fellow officers had to work. A 30-day suspension would have been an appropriate response to the Gruver incident to convey that message and acknowledge those considerations.

For all these reasons, I find that the Borough had just cause to discipline but not to discharge Grievant Frederick Lahovski.

## Award and Remedy

The grievance is sustained in part and denied in part. The Borough had just cause to discipline but not to discharge Grievant Frederick Lahovski. As a remedy, the Borough is directed to reduce the discharge to a 30-day suspension without pay. It is further directed to reinstate the Grievant to his former position with no loss of seniority and to make Grievant whole for any losses incurred as a result of his discharge, including back pay and benefits from the date of his discharge to the date of his reinstatement, less interim earnings and the 30-day suspension.

The Arbitrator shall retain jurisdiction of this matter for the sole purpose of resolving any dispute over the implementation of the remedy.

WALT De TREUX

EXHIBIT "L"



# NAZARETH BOROUGH
# POLICE DEPARTMENT
134 S. Main Street
Nazareth, PA 18064



DATE:_____

TO:         All Personnel, Nazareth Borough Police Department
FROM:       Chief Thomas Trachta, Nazareth Borough Police Department
SUBJECT:    **PO's Duties and Responsibilities to Provide Basic Police Services**

On Monday June 17, 2013 the undersigned circulated NBPD memo titled **Citizens Complaints – Handling Radio Assignments** because the undersigned was receiving numerous citizen complaints regarding some officer's attitudes and the way some radio assignments are being handled. Citizens were **complaining about a lack of service or cooperation with the police department.** The undersigned reminded All officers that they must remain professional at all times while dealing with the public. Officers need to be impartial when dealing with citizens and enforcing the laws. The officer's personal views should not be a factor while on duty and all citizens should be treated with respect and courtesy. The undersigned further reminded All officers that all contacts should be properly identified via OLN and that the OLN should be run via NCIC in regards to warrant checks. Officers should not be responding to the same location in regards to the same complaints over and over again. Officers can always choose to mediate many situations as long as all parties concerned are satisfied before the officer clears the call. However; if the officers are getting summoned back to the same location or one of the parties are not satisfied with the way the incident was handled; the incident should be referred to court via Non-Traffic Citation under the appropriate criminal charge such as Harassment, Disorderly Conduct, Public Drunkenness, etc. The undersigned went on to state that he realizes that officers cannot always please everyone they come in contact with. However; **it is totally unacceptable for officers to discount a citizen's complaint and/or become condescending while handling a call. Officers are here to serve and protect all the citizens while remaining open minded, unbiased and nonjudgmental. It is the officer's responsibility to try to assure a good quality of life for all the residents of the borough.**

On Friday, November 1, 2013 at approximately 2000 hours the undersigned was conducting an interview in regards to several drug investigations within the borough. There has been numerous drug overdoses involving young adults ages sixteen (16) to twenty-two (22) within the Nazareth area.

The undersigned was shocked and embarrassed when the parents of a seventeen year old stated that their child overdosed on illegal control substances and was removed to a local hospital and almost didn't survive. The parents further stated that when they did come to the NBPD-HQ looking for assistance from the police; allegedly they were told by an officer that there is not much that the police can do. The parents wanted the police to respond to a location within the borough because they believed there were illegal drugs

being used by other young adults at that time and that they may need help. The parents were allegedly told to come back when day shift was working which if true is totally unacceptable. This would be an example of gross negligence and dereliction of duty and could be grounds for termination.

It is the duty and responsibility of the on duty officer to expeditiously respond to and conduct an investigation whenever any possible crimes are reported to the police. The on duty officer must respond while the incident is occurring in order to bring the case to its proper conclusion as soon as possible barring any unforeseen circumstances. The undersigned is reminding all officers of their duties as sworn police officers. It is totally unacceptable for an on duty officer to refuse to do their job by referring a victim, complainant or reporting party to another officer, or to instruct the reporting party to come back at another time, ie day shift.

Again, this would be considered unacceptable behavior within a professional police department and an example of gross negligence which puts that officer, the NBPD and Borough in a very precarious situation.

All on duty officers will do everything legally possible for every victim, complainant or reporting party and prepare an incident report forthwith. The officer who first becomes aware by contact with the NCR dispatcher, the victim, complainant or reporting party either directly as a walk-in at NBPD-HQ or flagged down while in the street is responsible to document the occurrence via an incident report. Upon being advised of an incident it is the officer of record's case, and it is his or her responsibility to see it to its completion.

If an officer truly doesn't know how to proceed, a notification should be made to the undersigned forthwith via phone or NCR dispatcher. The undersigned is the only person that can re-assign a case or authorize additional officers to respond on overtime to assist. However; even if this does happen it is still the first officer's responsibility to start the incident report and document the facts up to that point.

The undersigned will decide which officer will follow-up on any open case and that is why it is imperative that all incidents are documented forthwith by the officer of record. The undersigned reviews all the incident reports and will prepare a supplement directing that the case is now turned over to another officer relieving the initial officer of his or her responsibility at that point. All officers will cooperate with the undersigned and each other in regards to all investigations, failure to do so would also be dereliction of duty.

The NBPD is here to serve and protect all the citizen of the borough; we work for the victims as a team. The undersigned will not tolerate this kind of alleged allegations; failure to provide basic police service. The undersigned wants to forewarn all members of this department that sub-standard police performance could lead to dismissal via the Borough Council. The undersigned truly can't comprehend any police officer actually saying something like this but it was reported. The undersigned will conduct an investigation into what exactly happened. The undersigned has made notifications to Mayor Strye and the Borough Solicitor that there may be pending litigation due to some statement that were made.

Case 5:14-cv-04983-JS  Document 1  Filed 08/26/14  Page 142 of 143



**NAZARETH BOROUGH
POLICE DEPARTMENT**
134 S. Main Street
Nazareth, PA 18064



August 7, 2014

TO:      PO Frederick Lahovski, Nazareth Borough Police Department
FROM:   Chief Thomas Trachta, Nazareth Borough Police Department
**SUBJECT: NBPD-IA #2012-020, Attempted Homicide of Maria Gruver**

On Monday, August 4, 2014 the undersigned was directed by Mayor Carl Strye to have
you sign off on the following question:

**PO Lahovski, do you recognize that you were suspended for thirty (30) days because
of the mishandling of the above assignment?**

YES_____ NO_____ Signature

The undersigned will maintain a copy of this memo and a copy will be placed in PO
Lahovski's personnel folder as per the Mayor.

For your information.

Chief Thomas Trachta
Nazareth Borough Police Department

Cc; Mayor Strye
    Borough Solicitors

Therefore the undersigned is instructing all members of this department to print their names, sign, and date in the space provided below in an acknowledgement that they read this memo and returned the signed copy to the undersigned without delay. Any officer who needs additional clarification must see the undersigned personally without delay.

Print Name _FRED_ _LAHOVSKI_

Signature _____ , Date: _8.8.14_

✱ _SIGNED UNDER DURESS & AS A CONDITION OF EMPLOYMENT_

All officers opinions are important, if any member of this department has an idea or concern they should notify the undersigned in writing so that the undersigned might be able to implement the appropriate changes. Thank you for your support and hard work.

✱ _IN COMPLIANCE W/ THE ABOVE I AM NOTIFYING YOU IN WRITING THAT THIS CORRESPONDANCE CONFLICTS W/ PREVIOUS DIRECTION &/OR LAWS._ _FL 8.8.14_

Chief Thomas Trachta
Nazareth Borough Police Department

Cc; Mayor Strye
Borough Solicitor